# Exhibit 12
# Part A

District Court, D. New Jersey

American Ceramicraft Inc. v. Eisenbraun Reiss Inc.

No. 92-2851

Decided June 16, 1993
(Unpublished)

PATENTS

1. Practice and procedure in Patent and Trademark Office — Re-examination — In general (§110.1501)

JUDICIAL PRACTICE AND PROCEDURE

Procedure — Stays — In general (§410.2901)

Stay of action seeking declaratory judgment of patent invalidity is not warranted pending Patent and Trademark Office's re-examination of patent in suit, since re-examination is not likely to settle controversy concerning patent at any time in near future, and thus plaintiff's need for declaratory relief remains alive.

PATENTS

2. Patent construction — Claims — Defining terms (§125.1305)

Ordinary meaning of "removably mountable," in claims for kit with minilights that can be attached to garments, does not encompass minilights attached permanently, such as with glue.

3. Patentability/Validity — Anticipation — Prior publication (§115.0705)

Claims for kit with minilights that can be attached to garments are anticipated by prior art publication.

4. Patentability/Validity — Obviousness — Secondary considerations generally (§115.0907)

Claims for kit with minilights that can be attached to garments are obvious, despite objective evidence of copying, commercial success, and long-felt need, since evidence of copying is not conclusive proof of non-obviousness, especially if external forces dictate nature of copied features, nor is commercial success conclusive evidence of non-obviousness, and since such objective evidence, although not insubstantial, does not negate evidence of prior art and ordinary skill in that art.

Particular patents — Electrical — Lighting kits

5,113,325, Eisenbraun, light assembly kit for illuminating an article of clothing, invalid.

---

Action by American Ceramicraft Inc. Andrew R. Ferber, Flora-Lite Co., and Lamrite West Inc. d/b/a Darice, against Eisenbraun Reiss Inc., for tortious interference with contract and future economic advantages, common law unfair trade competition and practices, and false representation in violation of Lanham Act's Section 43(a), 15 USC 1025(a), and for declaration of patent invalidity, in which defendant counterclaims for patent infringement. On plaintiffs' motion for partial summary judgment on claims of patent invalidity, and on defendant's motion to stay pending re-examination of patent. Plaintiff's motion granted.

[Editor's Note: The court has indicated that this opinion is "not for publication."]

Lerner, David, Littenberg, Krumholz & Mentlik, by Daniel H. Bobis, Roy H. Wepner, and Keith E. Gilman, Westfield, N.J., for plaintiffs.

Krass & Young, by Judith M. Riley and Allen M. Krass, Troy, Mich.; Connell, Foley & Geiser, by Richard D. Catenacci, Roseland, N.J., for defendant.

**Debevoise, J.**

Plaintiffs instituted this action seeking a declaratory judgment that U.S. Letters Patent No. 5,113,325 is invalid, and seeking injunctive and compensatory relief for tortious interference with contract and future economic advantage, common law unfair trade competition and practices, and false representation under section 43(a) of the Lanham Act, 15 U.S.C § 1025(a). Plaintiffs now move for partial summary judgment on their declaratory claims for invalidity, and Defendant cross-moves to stay this action pending the reexamination of its patent by the Patent and Trademark Office. This court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1338(a) (patents), jurisdiction over declaratory judgments under 28 U.S.C. § 2201, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

I. STATEMENT OF FACTS

The invention at issue in this patent litigation is a small, patented "minilight" kit that

can be easily affixed to a garment. Once affixed, the minilight kit provides a multiplicity of points of illumination for creating or highlighting designs. Plaintiff American Ceramicraft, Inc., ("American") is a New Jersey Corporation that manufactures and sells minilight kits. Plaintiff Andrew R. Ferber is the president of American, and he also sells the minilight kits independently. Plaintiffs Flora-Lite Company ("Flora-Lite") and Lamrite West, Inc., ("Darice") are a Florida unincorporated business entity and an Ohio corporation, respectively, that sell minilight kits purchased from Plaintiffs. Flora-Lite was originally a California corporation owned by Camille Savarese, and it relocated to Florida after its sale to Robert Kamins in September 1991. Defendant Eisenbraun Reiss, Inc., ("Eisenbraun") is a Michigan competitor of Plaintiffs.

The origin of this dispute dates to late 1991, when Defendant learned that Flora-Lite was selling minilight kits that appeared to duplicate its own minilights, and that Flora-Lite was marketing these kits using photocopies of Defendant's promotional literature. Defendant's counsel warned Flora-Lite by letter of September 6, 1991, that "[i]n order to avoid the necessity of legal action to prevent further violation of our client's rights and to compensate them for your past violations, we ask that you immediately contact us to discuss suitable terms for such termination and compensation." (Riley Decl., Ex. C.)

Robert Kamins, the owner of Flora-Lite, responded to the warning by reassuring Defendant that he regretted photocopying Defendant's literature and that he did not have any of the allegedly infringing minilights "available." Mr. Kamins also declared that "[w]e apologize for this incident and we can assure you that it will not happen again." (Riley Decl., Ex. D.)

Despite Mr. Kamins' declarations, Flora-Lite and the other plaintiffs apparently continued to sell the minilight kits. Thereafter, Defendant took further steps to protect its investment. In early 1992, Defendant notified at least one manufacturer that "any module made like ours, lights at the end of wires, etc. would infringe our patents. ... We will defend our patent when necessary." (Compl. at ¶ 23.) Defendant continued to warn Plaintiffs and their customers about infringement, and Plaintiffs advised Defendant that its warnings were unlawful. (*Id.* at ¶¶ 24-37.)

After the patent issued on May 12, 1992, Defendant allegedly sent Notice of Infringement letters to Plaintiffs Darice and Flora-Lite, with the notice to Darice marked to t attention of American and Mr. Ferber. (*I* at ¶ 38.) The parties exchanged several mo communications, and then Plaintiffs fil( this complaint. (*Id.* at 39-44.)

A. *The '325 Patent And Prior Inventio*

*The '325 patent.*

In May 1992 Ken Eisenbraun receive U.S. Letters Patent No. 5,113,325 ("th '325 patent") for his minilight kits. Th claims of the '325 patent are set forth in th margin.[1] In brief, the key features of th claims are as follows:

---

[1] 1. A light illuminating kit for use with a: article of clothing having a plurality of aperture formed therein by a user of said kit, said aper tures forming a pattern preselected by said user said kit comprising:

a plurality of light emitting elements constructed to protrude through respective apertures in said article of clothing;
a plurality of securement elements for securing said light elements to said article of clothing;
a central electronic control unit for controlling the actuation of each of said light elements;
a plurality of flexible wire pairs, each of a predetermined length and each independently wiring only one of said light elements to said central electronic control unit such that said one light element may be moved independently of one of any other of said plurality of light elements such that said any one light element is interchangeably insertable through any one of said plurality of apertures to illuminate said user preselected pattern when said plurality of light elements is actuated.

2. An illuminating light element kit as defined in claim 1 wherein said control unit has a fastener attached thereto for securing said control unit to an inside surface of said article of clothing.

3. An illuminating light element kit as defined in claim 1 further comprising an actuation switch operably mounted to said control unit for actuating and deactuating said control unit and said light emitting elements.

4. An illuminating light element kit as defined in claim 3 wherein said switch is a multi-position switch for actuating said control unit in a selected one of a plurality of different actuating modes.

5. An illuminating light element kit as defined in claim 4 wherein one of said plurality of actuating modes flashes various ones of said plurality of light emitting elements on at different times and another of said plurality of actuating modes maintains said light emitting elements constantly on.

6. An illuminating light element kit as defined in claim 1 wherein the preselected length of each of said flexible wire pairs is substantially equal.

7. An illuminating light element kit as defined in claim 1 wherein said control unit

Claim 1: a plurality of lights, designed to protrude through apertures in a garment, with each light independently attached by a pair of wires to a central control unit; and elements for securing the lights to the garment.
Claim 2: Claim 1, with a fastener to secure the control unit to the inside of the garment.
Claim 3: Claim 1, with an on/off switch.
Claim 4: Claim 3, with a multiposition on/off switch.
Claim 5: Claim 4, with the positions of the on/off switch including a position where the lights blink independently and a position where the lights burn steadily.
Claim 6: Claim 1, with the leads to the lights being of equal length.
Claim 7: Claim 1, with the lights blinking periodically.

---

flashes said plurality of light emitting elements on and off at periodic time intervals.

8. An illuminating light element kit as defined in claim 1 wherein said light emitting elements are light emitting diodes; and said kit further comprises a power supply mounted to said control unit and in electrical communication therewith.

9. An illuminating light element kit as defined in claim 8 wherein said power supply includes at least one removable battery, said control unit being receivable in a soft-sided case, said case having a fastener attached thereto for securing said case to an inside surface of said article of clothing.

10. An illuminating light element kit as defined in claim 9 wherein said control unit further includes a substantially flat circuit board, said at least one battery being mounted thereto such that when said control unit is inserted into said case, said case presents a substantially flat profile.

11. The kit of claim 1 wherein each of said plurality of securement elements comprises a resilient O-ring configured to retain a portion of one of said light emitting elements therein.

12: A device for forming a plurality of illumination patterns on an outer surface of a piece of flexible sheet material, said device comprising:
a plurality of light emitting elements configured to be removably mountable on said surface;
a central control unit for controlling the actuation of each of said plurality of light elements;
a plurality of flexible wire pairs, each of a fixed length and each independently wiring only one of said plurality of light elements to said central control units such that said one light element may be moved independently of one of any other of said plurality of light elements such that said plurality of light elements may be arranged on said surface to form any of said plurality of patterns.

Claim 8: Claim 1, with the lights being light-emitting diodes ("LEDs") and the kit containing a power supply.
Claim 9: Claim 8, with a removable battery, a control unit in a soft-sided case, and an attachment to secure the case to the garment.
Claim 10: Claim 9, with the control unit and attached battery having a substantially flat profile.
Claim 11: Claim 1, using O-rings to secure the lights to the garment.
Claim 12: A plurality of lights, designed to be removably mounted on an (unspecified) outer surface, with each light independently attached by a pair of wires to a central control unit.

Thus, the patent contains only two independent claims: claims 1 and 12. Each of the features of claim 1 appears in claims 2-11, and claim 12 stands on its own.

The invention described in the '325 patent was not the first small device with multiple lights, nor the first to be affixed to a garment. As described below, the parties have identified several other devices that preceded the '325 patent.

*The Shenker Patent.* The Shenker Patent, U.S. Letters Patent No. 4,823,240, issued April 18, 1989, discloses an "audio-visual assembly for articles of clothing." (Pls.' Ex. 3A.) The visual aspect of the Shenker patent, which is the relevant aspect here, included the following features: minilights (including LEDs) attached to an activating device, with the whole assemblage removably affixed to the inside of a garment and positioned so that the minilights protruded through holes to illuminate the garment's outer surface. The "second embodiment" of the patent specification also includes O-rings for securing the minilights to the garment.

The key difference between the Shenker and '325 patents is that the Shenker patent disclosed a device where every minilight was wired directly to the other minilights to form a closed array. By comparison, each minilight in the '325 patent was separately attached to the control unit and could be placed on the garment independently of the others. Thus, the '325 patent provides more flexibility in the illumination of garment designs. (Pls.' Ex. 2 at 73-76.)

*The Beard Patent.* The Beard Patent, U.S. Letters Patent No. 4,367,515, issued January 4, 1963, discloses a roller skate minilight attachment. (Pls.' Ex. 3B.) The patent included the following features: LEDs affixed to a toroidal disk, with each LED attached to a power supply and a control unit.

In two of the manifestations of the invention, the individual LEDs appear to be connected by individual lines to a common trunk line which, in turn, is connected to the controller. (*Id.*, Figs. 4, 6.) In the other manifestation, the LEDs appear to be individually connected to the control circuit so that the circuit can direct the LEDs to flash in sequence. (*Id.*, col. 4, Figs. 3, 5.) However, in prosecuting its patent, Defendant contended to the Patent and Trademark Office that the LEDs were not independently wired to the control circuit. (Pls.' Ex. 2 at 76-77.)

The key differences between the Beard and '325 patents are the asserted lack of independence among the minilights in the Beard patent, their fixed attachment to the toroidal disk, the lack of a multiposition switch, and the absence of any adaptations for use with a garment. (*Id..*)

*The Miller Patent.* The Miller Patent, U.S. Letters Patent No. 4,164,008, issued August 7, 1979, discloses an illuminated article of clothing. (Pls.' Ex. 3C.) The patent included the following features: minilights affixed to a flexible printed circuit board attached to the interior of a shirt with holes for the minilights to poke through, with the minilights connected to a power supply and a control unit.[2] The circuit board assemblage was either to be "integrally" attached to the shirt by "adhesive," or removably attached with velcro.

The key differences between the Miller and '325 patents are the lack of independence among the minilights in the Miller patent, their fixed attachment to the printed circuit, the lack of removability of the device from the garment, the lack of a multiposition switch, and the lack of individual securement elements for the minilights.

*Type A Minilights.*[3] From at least 1981, Flora-Lite (then a California firm owned by Ms. Savarese) has sold "type A" minilight kits. (Savarese Decl. at ¶¶ 3, 10, 19, 20.) Type A minilight kits include six-to-ten incandescent minilights (not LEDs), each of which is independently attached to a power source by a pair of flexible wires. The wires are all the same length for each kit, varying from six to thirty-six inches for different kits. (*Id.*, ¶ 9.)

Plaintiffs have submitted a variety of kinds of evidence to support their characterization of Type A minilights. To demonstrate the physical nature of the minilights, Plaintiffs have submitted several samples of minilights sold as early as July 1990. (Pls.' Exs. 8, 9; Savarese Decl. at ¶ 14.) To demonstrate the sales of Type A minilights, Plaintiffs have provided a series of invoices for various minilights that Flora-Lite purchased from its Taiwan suppliers between July 1986 and March 1990 (Pls.' Exs. 5, 15); correspondence between Flora-Lite and its Taiwan suppliers in 1989-90 (*id.*, Exs. 13, 14); promotional material from the California Flora-Lite (*id.*, Ex. 4 (most of the California address is covered with a Florida label); invoices for variously-named minilights that Flora-Lite had sold to United States customers between November 1987 and September 1990 (*id.*, Exs. 6, 20); and three publications teaching how to use the minilights in clothing, all copyrighted in 1990 (*id.*, Exs. 22, 24, 25).

The key differences between the Type A minilights and the various '325 patent claims are that the Type A minilights do not have a multi-position flasher control unit, they do

---

[2] The patent examiner found that the Miller patent also disclosed a multi-position switch. (Pls.' Ex. 2 at 56.) In fact, the Miller patent does not seem to disclose such a switch. The examiner may have concluded that the patent disclosed such a switch from the language "a timing circuit can be included whereby the light emitting devices will be illuminated intermittently or continuously for a predetermined amount of time following energization by the switch 26." (Pls.' Ex. 3 at col. 3, lines 43-46.) What this language seems to mean is that a timing circuit can be used in conjunction with either a device with a blinking circuit or a device with a continuous circuit, but not that a single device will have both types of circuits selectable by a multiposition switch.

[3] The various documents in Plaintiffs' exhibits refer to the lights by their part numbers, as summarized in the following list. For the purposes of this list, the following conventions are used: the type of minilight (LED or incandescent) is given if known, but otherwise the lights are simply called "lights;" the type of illumination (twinkle or steady) is given if known; and in general, "D" signifies multicolored lights, "T" signifies twinkling lights, "W" signifies white wires, and "G" signifies green wires. (Savarese Decl. at ¶ 13.) #002 = ten white lights, each attached to the power and control unit by its own 20-inch white wires; #002-D = ten multi-color 20-inch incandescent lamps attached by 20-inch green wires to a steady controller; #002-DT = ten multicolor LEDs attached by 20-inch wires to a twinkle controller; #002-TG = ten white incandescent lamps attached by 20-inch green wires to a twinkle controller; #003 = seven white lights attached by twelve-inch white wires; #003-G = seven white incandescent lamps attached by twelve-inch green wires to a steady controller; #004 = ten white incandescent lamps attached by thirty-six-inch green wires to a steady controller; #006 = six white incandescent lamps attached by six-inch white or green wires. (Savarese Decl. at ¶ 9; Kamins Decl. at ¶ 4.)

not include LEDs, they do not come with elements or fasteners for attaching the minilight kit to a garment, and the power supply is not soft-sided.

*Type B Minilights.* Type B minilights are identical to Type A minilights except that the minilights are attached directly to a control chip that causes the minilights to twinkle. Ms. Savarese searched for an appropriate "twinkle" control chip for several years in the late 1980s before finally discovering a suitable twinkle chip in Taiwan in March 1990. Upon obtaining sample minilights containing the twinkle chip, Ms. Savarese quickly distributed them to potential customers. (Savarese Decl. at ¶ 21; Pls.' Ex 11 (twinkling minilight from Florida).) As evidence of this distribution, Plaintiffs have submitted invoices and correspondence between Ms. Savarese and the potential customers (Pls.' Exs. 16-18), as well as invoices and communications between Ms. Savarese and her Taiwan suppliers (*id.*, Exs. 14, 15).

Type B minilights appear identical to Type A minilights except for the control circuit that causes the twinkling. Note, however, that this control circuit is not a multi-position circuit — it only has an "off" and a "twinkle" position.

*Type C Minilights.* Type C minilights are identical to Type B minilights except that Type C minilights use LEDs rather than ordinary incandescent lamps. (Pls.' Ex. 7; Savarese Decl. at ¶ 14.) Ms. Savarese first encountered Type C minilights at the time she discovered her twinkle chip. (Savarese Decl. at ¶ 21.) As with the Type B minilights, Ms. Savarese quickly distributed Type C minilight samples and products to her customers. As evidence of the distribution of the Type C minilights, Plaintiffs have submitted invoices and correspondence between Ms. Savarese and her customers and between Ms. Savarese and her Taiwan suppliers. (Pls.' Exs. 14-16, 18.)

*Oberbeck Shirts.* Peggy Oberbeck began making and selling garments decorated with minilight kits in late 1987. In the beginning, she used minilights that were wired directly to one another. However, in June 1989 Ms. Oberbeck met Ms. Savarese at a California crafts show and purchased two dozen Flora-Lite minilights. (Oberbeck Decl. at ¶ 6; Pls.' Ex. 20 (invoice).) One month later, Ms. Oberbeck met Ms. Savarese at a Chicago crafts show and sold Ms. Savarese a Christmas tree sweatshirt lit with Flora-Lite minilights, apparently Type A. (Oberbeck Decl. at ¶ 6.) Once Type B minilights became available, Ms. Oberbeck used these on sweatshirts as well. (*Id.* at ¶ 8; Savarese Decl. at ¶ 25.)

Ms. Oberbeck initially attached the Flora-Lite minilights to her sweatshirts by sewing buttonholes into the sweatshirts, inserting the minilights through the buttonholes, gluing the minilights to the inside of the sweatshirt, and then covering the wiring and minilights with a velour insert attached to the sweatshirt with velcro. The battery pack was also attached to the inside of the sweatshirt with velcro. (Oberbeck Decl. at ¶ 8; Savarese Decl. at ¶ 25.)

Later on, in a book copyrighted in 1990, Ms. Oberbeck described a second method of attaching the minilights. In this method, the minilights were glued to the velour insert instead of to the sweatshirt, and the velour insert was then attached (in an unspecified fashion) to the inside of the sweatshirt with the minilights poking through buttonholes. (Pls.' Ex. 21.) Ms. Oberbeck also provided instructions for this latter method in two pattern booklets. (Oberbeck Decl. at ¶ 13, Pls.' Exs. 22, 24.)

*Savarese Shirts.* Ms. Savarese created her own sweatshirt illuminated with minilights in April or May 1990. Her technique for affixing the minilights to the sweatshirt was simpler than that used by Ms. Oberbeck — Ms. Savarese affixed the minilights in place with ordinary tape, and placed the control and battery pack into a pocket sewn on the inside bottom hem. (Savarese Decl. at ¶ 26; Pls.' Ex. 19.) Ms. Savarese displayed her sweatshirt to promote her products in various trade shows, but it is not clear from her declaration when the first of these trade shows took place.[4]

Sunshine Fun, a manual published in February 1990, disclosed the details of Ms. Savarese's simple technique. (Pls.' Exs. 25, 26 at 32.) This manual recommended using a ten-light Flora-Lite minilight set by inserting the minilights through holes in a garment and taping them on the inside.

*O-Ring Shirts.* Ms. Oberbeck recalls seeing shirts around Christmas-time in 1989 where the maker of the shirts had affixed the

---

[4] In her declaration, Ms. Savarese states that "[s]ince the time it was made [April/May 1990], I used this lighted Christmas teddy bear shirt at trade and craft shows in the United States and otherwise to promote Flora-Lite mini-light kits." (Savarese Decl. at ¶ 26.) As discussed *infra*, Plaintiffs must establish by clear and convincing evidence that the prior art was in public use or on sale before August 1, 1990. The above statement does not establish by clear and convincing evidence that Ms. Savarese displayed her sweatshirt prior to August 1, 1990.

minilights with O-rings. The O-rings "were to be used on the outside of the shirt and over the mini-lights to hold the lights in place." (Oberbeck Decl. at 14.) She again saw O-rings used in July 1990 at a crafts show, and spoke with someone about the O-ring technique. (*Id.*) However, Ms. Oberbeck does not describe the type of minilight that was used.

Beginning in 1986, Ms. Savarese also saw garments where the maker had affixed minilights with O-rings. (Savarese Decl. at ¶ 5.) Ms. Savarese implies that the minilights that she saw were those from Flora-Lite, but she does not describe the exact method of attachment.

The key differences between the '325 patent and the assemblages used with these O-ring shirts appear to be that the assemblages may not have had multiposition controls, a twinkle feature, or LEDs, and the assemblages probably had hard-sided, boxy battery packs. However, neither Ms. Savarese's nor Ms. Oberbeck's description is detailed enough to provide a clear picture of the entire minilight-shirt-O-ring assemblage.

*Defendant's Old-style Minilights.* Prior to his invention of the '325 patented device, Mr. Eisenbraun sold a minilight kit in which all the minilights were affixed to a soft plastic sheet that the user could attach to the inside of a shirt. Since the minilights were permanently affixed to the sheet, each kit could only light up a single pattern.

*New-style Minilights and Lightables.* In addition to the devices and garments described above, the parties have submitted as exhibits other, newer, devices sold by Flora-Lite, Darice, and Defendant. These devices apparently do not predate the patent application by more than one year, and hence cannot anticipate the patent.

The Flora-Lite and Darice new-style minilight kits have white or multicolored blinking LEDs attached by separate, 10-inch wires to a flat, hard control unit and batteries. Each kit comes with a package of O-rings, and all of the LEDs have flat bases that extend beyond the circumference of the LED. (Pls.' Exs. 28; Eisenbraun Decl., Exs. G, H.)

Defendant has also submitted one of its own minilight kits, marketed under the name "Lightables." (Eisenbraun Decl., Ex. A.) The Lightables kit is substantially identical to Plaintiffs' new-style minilight kit, except that Lightables have a push-button switch and a soft cover.

According to Defendant, Flora-Lite and Darice introduced their new-style hard-cover minilight kits in late 1991, about nine months after Defendant's new-style kit appeared on the market in January of that year. (Eisenbraun Decl. at ¶¶ 7, 14, 16, 18.) Defendant suggests that the Flora-Lite and Darice minilight kits are direct copies of its own kits. (Def.'s Opp'g Br. at 4-5.)

### B. *The Commercial Success of Lightables*

Defendant has submitted evidence that Lightables, which were built according to the '325 patent, enjoyed immediate commercial success. Prior to the introduction of Lightables, Defendant's sales of its old-style minilights amounted to 10,000 units in 1989 and 64,000 units in 1990. After Defendant introduced Lightables in early 1991, the old-style sales declined to 21,000 in that year and to 10,000 in 1992. By comparison, the sales of Lightables boomed. Lightables sold 176,000 units in 1991 and 663,000 in 1992, and Defendant projects sales of 700,000 in 1993. (Eisenbraun Decl. at ¶ 12, Ex. C.)

Defendant estimates that Plaintiffs have been somewhat less successful with their new-style minilights, with Flora-Lite selling about 75,000 units each year and Darice selling about 100,000 each year.

Defendant attributes the success of new-style minilights to flat, light cases made possible by their small batteries; short, flexible wires; LEDs; and a configuration that allows easy mounting on different garments and patterns. (Eisenbraun Decl. at ¶ 13.) Defendant specifically denies that the success was due to new or additional advertising, fancy packaging, cost cuts, sales through tying arrangements, or anything other than improvements in the minilights themselves. (*Id.* at ¶ 22.)

## II. PROCEDURAL AND PATENT PROSECUTION HISTORY

Kenneth Eisenbraun first applied for a patent on his minilight kit on August 1, 1991. (Pls.' Ex. 2.) The original application contained 15 claims, three of which were independent. Defendant subsequently discovered that Plaintiffs were selling what appeared to be an infringing product. Consequently, in late September of 1991, Defendant requested that the U.S. Patent and Trademark Office ("the PTO") treat the patent application with special urgency. The PTO granted the request.

Shortly thereafter, Defendant amended its patent on its own initiative to "clarify" the claims and "help distinguish them over the prior art." (Pls.' Ex. 2 at 52.) The amendments simply rephrased sections of the initia

claims and replaced claims 11-15 with claims 16 and 17, which later became claims 11 and 12.

One section of rephrasing is worth noting in detail, since it involves the controversial "securement elements," elements such as O-rings for attaching the minilights to the garment. As originally drafted, the securement elements were described as "a plurality of securement elements for affixing said light elements extending through said apertures." The October amendments redrafted this section to specify "a plurality of securement elements for securing said light elements to said article of clothing." (Pls.' Ex. 2 at 47.)

On December 31, 1991, the PTO examiner issued an office action rejecting all of the claims of the patent. In part, the examiner rejected the claims because of technical and grammatical errors in drafting, such as failure to properly label the figures and failure to provide antecedents for referential terms like "*said* light emitting elements." More substantively, the examiner found that the patent was obvious in light of the Shenker, Miller, and Beard patents. The examiner found that, in the aggregate, these patents disclosed light emitting elements and LEDs, flexible independent wiring, control units, multiposition switches,[5] removable batteries, and soft-sided cases secured to the garment.

Defendant responded to the examiner's technical and grammatical objections by amending the patent to correct the various errors and by cancelling claim 1 and adding claim 18. (Pls.' Ex. 2 at 67-79.) Claim 18 had several differences from the earlier claim 1, including a new description of the wiring that independently connected each minilight to the control unit.

Defendant responded to the examiner's substantive objections by redrafting the claims to emphasize the minilight's versatile wiring arrangement. This arrangement allowed a user to illuminate any of an infinite number of garment designs, because each wire was independently attached directly to the control/power unit rather than to the other minilights. Defendant also mentioned the use of O-rings as securement elements. O-rings were desirable because the user could easily disassemble the minilight-garment to wash the garment or to transfer the minilights to another garment.

After a few more technical corrections, the PTO issued the '325 patent on May 12, 1992. Two months later, on July 14, Plaintiffs filed this suit, and two weeks after that Defendant requested the PTO to reexamine the validity of claim 12, the broadest claim of its patent.

Defendant sought reexamination of claim 12 in order to test its validity against certain prior publications that Plaintiffs had disclosed to Defendant after the '325 patent had issued. These publications included the labels from Type A and Type B minilight kits, the Sunshine Fun manual (describing how to use minilights by attaching them to garments with tape), and Mary Maxim publications recommending the old-style kits for illuminating sweatshirt patterns. (Def.'s Opp'g Br. at 6.) Since these publications had not been among the materials reviewed by the examiner during the patent prosecution, Defendant was concerned that claim 12 might not be patentable. In particular, it is worth noting that Sunshine Fun, which I find invalidates several of Defendant's claims, was not disclosed to the patent examiner during the initial examination.

On August 21, Defendant joined the litigation by answering the complaint, counterclaiming for patent infringement, and moving to stay the litigation pending the outcome of the reexamination. By order of September 14, 1992, I denied Defendant's request for a stay. Two months later, on October 7, the PTO denied Defendant's request for reexamination. Defendant had apparently failed to substantiate the dates of certain of the publications. (Pls.' Ex. 26 at 28.) Thereafter, Defendant supplied the PTO with the requested documentation and the PTO agreed to reexamine the patent.

Upon reexamination, the PTO rejected all of the claims as obvious because of the Shenker and Miller patents and the Flora-Lite minilights. (3d Gilman Decl.) Defendant responded to the PTO action by replacing the rejected claims and adding new claims, but the PTO also rejected these claims as obvious. Defendant continues to argue that its claims should be allowed, and it has submitted a reply to the PTO's final rejection. The PTO has not yet responded to Defendant's reply.

### III. DISCUSSION
#### A. *Standard of Review*

Plaintiffs now move for summary judgment on their declaratory claim of patent invalidity, and Defendant renews its request that I stay this action pending reexamination.

Plaintiffs contend that certain of the claims of the '325 patent are invalid because

---

[5] *See supra* note 2.

the claims were anticipated by earlier minilight kits or, in the alternative, because the '325 patent was obvious. Since patent claims are presumptively valid,[6] 35 U.S.C. § 282, Plaintiffs must advance clear and convincing evidence in order to succeed. *Buildex Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1462 [7 USPQ2d 1325] (Fed. Cir. 1988). This "clear and convincing" standard is an intermediate one, more demanding than the "preponderance" standard but less so than the "beyond reasonable doubt" standard. *Id.* It applies to all of my factual findings below.

A court must grant summary judgment if the moving party establishes that "there is no genuine issue as to any material fact and that ... [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the moving party has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), *rev'g* 723 F.2d 238 (3d Cir. 1983). The opposing party must set forth specific facts showing a genuine issue for trial, and may not rest upon the mere allegations or denials of its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *First National Bank v. Cities Service Co.*, 391 U.S. 253, 289, *reh'g denied*, 393 U.S. 901 (1968); *Sound Ship Bldg. Corp. v. Bethlehem Steel Co*, 533 F.2d 96, 99 (3d Cir.), *cert. denied*, 429 U.S. 860 (1976).

A genuine issue for trial is present whenever "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986). In contrast, whenever "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' "[7] *Matsushita*, 474 U.S. at 587. In evaluating the record, the court must both weigh the evidence and draw inferences from it "in the light most favorable to the party opposing the motion." *Whitehead v. St. Joe Lead Co., Inc.*, 729 F.2d 238, 251 (3d Cir. 1984) (quoting *Coastal States Gas Corp. v. Department of Energy*, 644 F.2d 969, 979 (3d Cir. 1981)); *Wahl v. Rexnord, Inc.*, 624 F.2d 1169, 1181 [206 USPQ 865] (3d Cir. 1980).

In the present case, the parties have provided the court with extensive documentation of the nature of earlier minilight kits, the use of these kits, the prosecution history of the '325 patent, and the display and sales of minilight kits. Although Defendant has challenged many of Plaintiffs' conclusions,[8] Defendant has not challenged the authenticity of Plaintiffs' documents or physical exhibits. Accordingly, summary judgment is appropriate to the degree that these documents and exhibits are sufficient to establish Plaintiffs' right to judgment as a matter of law.

### B. *Stay Pending Reexamination*

Defendant argues that I should stay this action because the '325 patent is undergoing reexamination with new claims directed to

---

[6] Section 282 of Title 35 states that:

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

[7] In theory, the summary judgment standard in a case seeking to declare a patent invalid differs from that in an ordinary civil case because of the different evidentiary standards. Thus, in an ordinary civil case, summary judgment is appropriate unless "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party" by a preponderance of the evidence. In a patent case, summary judgment is appropriate unless "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party" by clear and convincing evidence. As a practical matter, however, summary judgment standards do not change with the underlying evidentiary standard. Courts generally deny a motion for summary judgment if any material disputed facts appear in the record, regardless of the evidentiary weight of those facts. This is the case here. I have had no need to weigh the facts because the parties do not dispute the facts on which I have relied.

[8] Defendant also argues that "[w]hen a claim is in dispute, it is necessary to inquire into extrinsic evidence, including the specification, the prosecution history and the claims, all of which reveal underlying factual disputes which preclude summary judgment." (Def.'s Opp'g Br. at 14.) In support of this argument, Defendant cites *Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033 [4 USPQ2d 1450] (Fed. Cir. 1987). In *Tillotson*, the Federal Circuit vacated the district court's claim interpretation on motion for summary judgment. In particular, the Federal Circuit stated that expert testimony was necessary to understand the disputed interpretations of the prior art and prosecution history. Here, there appear to be no disputed interpretations of the prior art relied upon herein or the prosecution history. The only dispute is whether the claims read on the prior art.