# Exhibit 12
# Part B

more-specific subject matter. This argument is similar to one that Defendant advanced before, and I will reject it now for many of the same reasons that caused me to reject it earlier.

Defendant asserts that it is necessary to await the outcome of the reexamination because "one can not know what claims may emerge from this procedure" or, in other words, "reexamination of the patent may moot the claim of invalidity." (Def.'s Opp'g Br. at 5 (citing *Albest Metal Stamping Corp. v. Randolph-Road Corp.*, 648 F.Supp. 475 (S.D.N.Y. 1986) (staying the action pending reexamination because the reexamination would resolve the validity issues before the court)).)

Even though the PTO reexamination may ultimately moot the claim of invalidity, the PTO has not yet done so. The PTO will cancel a claim only after "the time for appeal has expired or any appeal proceeding has terminated," 35 U.S.C. § 307, and these events have not yet transpired. In addition, even if the reexamination is unfavorable, Defendant intends to continue to press the validity of its patent. (Krass Let. of May 27, 1993.) Thus, the '325 patent is far from dead.

[1] Accordingly, I will not stay this action pending the resolution of Defendant's reexamination. The reexamination is not likely to settle the controversy over the '325 patent any time in the near future, and hence Plaintiffs' need for declaratory relief remains very much alive. As long as the validity of the '325 patent remains in doubt, none of the parties here can put this matter behind them and go about the business of manufacturing and selling minilights.

## C. *Claim Construction*

The first task in assessing the '325 patent is to construe its claims. The construction of patent claims is a question of law, to be resolved by examining the language of the patent, the surrounding claims, the patent specification, and the prosecution history. *Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033 [4 USPQ2d 1450] (Fed. Cir. 1987).

In general, "a claim must be construed to uphold its validity if possible." *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 749 [3 USPQ2d 1766] (Fed. Cir. 1987), *cert. denied*, 484 U.S. 1007 (1988). Of course, this does not mean that a court can distort the words of a claim beyond their ordinary meaning. *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1579 [6 USPQ2d 1557] (Fed. Cir. 1988). Even though a court may construe the claims to uphold validity, a court "can neither broaden nor narrow the claims to give the patentee something different than what he has set forth." *E.I. Du Pont De Nemours & Co. v. Phillips Petroleum*, 849 F.2d 1430, 1433 [7 USPQ2d 1129] (Fed. Cir.), *cert. denied*, 488 U.S. 986 (1988).

A court will go beyond the bounds of a claim's ordinary meaning only if the inventor has chosen to create a special vocabulary to describe the invention. The most important guide to the inventor's vocabulary is the patent specification, because "words must be used in the same way in both the claims and the specification." *ZMI Corp.*, 844 F.2d at 1580; *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569-70 [219 USPQ 1137] (Fed. Cir. 1983). However, a court can only use the specification as an aid to interpretation, and not as a license to introduce extraneous limitations into the claims. "Where a specification does not require a limitation, that limitation should not be read from the specification into the claims." *E.I. Du Pont*, 849 F.2d at 1433.

The claims themselves can also be resources for discovering the meaning of their words. Importantly, "'where some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or to escape infringement.'" *Fromson*, 720 F.2d at 1570.

Another important resource for claim construction is the prosecution history, or "file wrapper," of the patent. The file wrapper often discloses that the patentee has disavowed certain claim interpretations during the course of prosecution. Once disavowed, these interpretations cannot be resurrected later to enlarge the scope of the patent. *ZMI*, 844 F.2d at 1576; *Fromson*, 720 F.2d at 1570-71.

In the present case, the parties appear to disagree about five issues of claim interpretation: first, whether some or all of the claims require that the minilights be removably affixed to the garment (Def.'s Opp'g Br. at 11); second, whether taped or glued minilights in particular are covered by the claims; third, whether any of the claims require that the minilights have an enlarged base (Eisenbraun Decl. at ¶ 9); fourth, whether the earlier Types A-C battery/control units have a "substantially flat profile" within the meaning of the claims; and fifth, whether the Savarese pocket is a "fastener" for securing the control unit.

[2] The first of these issues is whether the claims require that the minilights be removably affixed to the garment. With regard to

claim 12, I find that the ordinary meaning of "removably mountable" does not encompass minilights attached permanently, for example with glue. However, claim 1 is more difficult. Fortunately, it is not necessary to resolve whether claim 1 reads on nonremovable minilights, because I find below that claim 1 does not read on glue for other reasons.

The second issue is whether any of the claims of the patented invention read on either taped or glued minilights in particular. With regard to claim 12, the answer seems clear. Claim 12 does not read on permanently-glued minilights, since these are not "removably mounted." On the other hand, claim 12 does read on taped minilights. Tape is easily removed,[9] and claim 12 does not specify the nature of the mounting elements or, indeed, even call for any mounting elements.

Claim 1 is somewhat more difficult. At the outset, however, it is clear that I must construe the securement elements specified in claim 1 to include more than just O-rings. As discussed above, a court must construe each claim in terms of the others, and refrain from importing limitations from one claim into another. *Fromson*, 720 F.2d at 1570. Since claim 11 is limited to O-ring securement devices and claim 1 is not, I must construe claim 1 to read on securement devices other than O-rings.

Since I find that claim 1 reads on more than just O-rings, I must next determine whether it extends all the way to tape. Defendant argues that a piece of tape cannot constitute a securement element because (1) it is not easily removable, (2) the tape only secures the wires, not the minilights, and (3) I must construe "securement elements" as narrowly as necessary to uphold the patent.

I will reject Defendant's first argument because ordinary tape is easily removable from garments. I will also reject Defendant's second argument, that the securement elements must attach directly to the minilights themselves. Claim 1 only requires that the securement elements function by "securing said light elements to said article of clothing." This language requires securement, but it does not specify the form of the securement. The minilights will be secured no less staunchly if the securement elements attach to the wires at the minilights' bases rather than to the minilights themselves. Furthermore, nothing in the prosecution history, the specification, or the prior art suggests that it is important that the minilight elements themselves be attached. The desirable features of the securement elements were securement and removability, not attachment to the minilight.

Finally, I must reject Defendant's third argument, that I should construe the claims as narrowly as necessary to uphold the patent. "'Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth.'" *E.I. Du Pont*, 849 F.2d at 1433 (quoting *Autogiro Co. of America v. United States*, 384 F.2d 391, 395-96 [155 USPQ 697] (Ct. Cl. 1967)). Here, Defendant has simply claimed elements to secure minilights to a garment. Although Defendant has specified a particular element in claim 11, Defendant only specifies elements broadly in claim 1. Nothing in the prosecution history or specification require limitations on claim 1's broad language, and I cannot conjure up a limitation solely to preserve the validity of the claims.

Even though I find that securement elements include tape, I find that they do not include glue, at least not literally.[10] Admittedly, claim 1 admits of a construction by which glue is a securement element. Claim 1 calls for a kit containing a "plurality of securement elements," which I might construe to be a kit containing a tube holding a plurality of daubs of glue. However, such a construction is somewhat strained, and a court should not strain to strike down patent claims. *Lewmar Marine*, 827 F.2d at 749 (Fed Cir. 1987). I find that the ordinary meaning of a kit containing a plurality of securement elements is not a kit with a single tube of glue. In other words, claim 1 does not read on glue.

Similarly, claim 1 does not read on the Oberbeck method of gluing the minilights to a single strip of velour and then attaching the velour to a shirt. (Pls.' Ex. 21.) A strip of velour is not a plurality of securement elements.

The third issue of claim construction is whether the patent claims require that the minilight have a flat base. The patent claims

---

[9] The publication Sunshine Fun comments that "[t]he electric Lite Set has to be removed to wash the shirt and the masking tape can easily be pulled off."

[10] Although glued minilights might infringe the '325 patent, anticipation is assessed by a stricter standard than infringement. A product anticipates a patented invention only if the product possesses every feature of the invention, whereas a product can infringe a patent as long as it possesses features equivalent to those of the invention. *Lewmar Marine*, 827 F.2d at 747-48.

themselves say nothing about a flat base, and so a flat base might be required only if securement elements such as O-rings were also required. As discussed above, claim 1 is not limited to securement elements such as O-rings. Accordingly, I find that the claims do not require minilights with flat bases.

The fourth issue of claim construction is whether a battery-pack such as those in old-style minilights "presents a substantially flat profile," as specified in claim 10. When examined closely, the words "substantially flat profile" are hardly self-explanatory. The word "flat" alone, in the context of a three-dimensional object, seems clear enough. "Flat" ordinarily connotes "having the major surfaces essentially parallel and distinctly greater than the minor surfaces." Webster's Ninth New Collegiate Dictionary 470, def. 5 (1983). However, the word "profile" creates some difficulties. "Profile" connotes "a representation of something in outline," id. at 939 def. 1, or in other words, a two-dimensional projection of a three-dimensional object. Thus, something flat in profile need not be flat in actuality.[11]

The specification provides a bit of gloss on the function of a "flat profile." Although the specification does not use the word "profile," it does explain that a "flat" case "can be used without causing a protrusion on the shirt . . . or be otherwise visible."[12] Thus, it would seem that the most desirable feature of the case is not that it have a "flat profile," but rather that it be small enough to hide under a garment.

Fortunately, it is not necessary to determine whether claim 10 requires that the case be small and flat, or only flat, or only flat in profile. The Type A minilights appear to have a control/power unit that is all of the above. These minilights are about 2 3/16 inches long, 1 3/16 inches wide, and 9/16 inches in height. Although the exact physical bounds of "substantially flat" are not clear, I find that, in the present context, a width-to-height ratio of over 2-to-1 is "substantially flat." In addition, the control/power unit is flat in profile and small enough to hide under a sweatshirt.[13]

The final issue of claim construction is whether the pocket in the Savarese shirt meets the claim 2 requirement of a "fastener attached [to the control unit] for securing said control unit to an inside surface of said article of clothing," or the claim 9 requirement of a "fastener attached [to the soft-sided case] for securing said case to an inside surface of said article of clothing." In other words, claim 2 requires a fastener attached to the control unit, and claim 9 requires one attached to the case.

The Sunshine Fun pocket seems to be a "fastener," but it is not clear whether it is "attached" to the control unit as in claim 2. According to Webster's, to attach is to "make fast (as by tying or gluing)." Webster's at 113 def. 4. A person does not ordinarily think of a pocket as being "attached" or made fast to the contents of the pocket. That is, a pocket may be attached to a garment, and the pocket may be a fastener that attaches its contents to the garment, but the pocket itself is not attached to its contents. On the other hand, the specification suggests that the most important aspect of the fastener is that it allow easy removability. The prosecution history also emphasizes removability. (Pls.' Ex. 2 at 74-76.)

In view of the specification and prosecution history, I could probably stretch claim 2 far enough to read on a pocket. But since a court should not stretch the language of a claim in order to find it invalid, I will refrain from finding that claim 2 reads on the pockets in the Savarese shirt and Sunshine Fun.

In contrast, I find that the fastener in claim 9 does read on a pocket. The pocket is plainly a soft-sided case, and the thread or glue described in Sunshine Fun is plainly a fastener. Thus, claim 9 reads on a pocket glued to a garment.

In summary, I find that both claim 12 and claim 1 read on minilights taped to a garment, but neither reads on minilights glued to a garment. In addition, I find that Type A minilights have a control/power unit that is "substantially flat in profile," and that claim 9 reads on inside pockets but claim 2 does not.

---

[11] For example, a long thin cylinder could not be considered flat. But a cross-section along the cylinder's long axis would display a flat rectangular profile, with the length much greater than the width. Thus, a long thin cylinder would be flat in profile without being flat in actuality.

[12] The prosecution history shows that, as originally drafted, claim 10 called for a "substantially flat" case. Defendant changed this language in its initial amendments to "a substantially flat profile" without explanation.

[13] The Types B and C minilights have a somewhat boxier control/power unit because of their twinkle chip. Type B minilights are the boxiest, at 2 3/16 inches long, 1 1/4 inches wide, and 7/8 inches in height. Type C minilights are 2 3/16 inches long, 1 3/16 wide, and 3/4 inches in height.

### D. *Anticipation*

Having reviewed the prior art and construed the claims, the next task is to place the claims side-by-side with the prior art and ascertain which claims were anticipated. Prior art anticipates an invention when "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. ..." 35 U.S.C. § 102(b).

An invention has been "described in a printed publication" if a tangible, enabling form of the invention has been made available to the public. *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560 [7 USPQ2d 1057] (Fed. Cir.), *cert. denied*, 488 U.S. 892 (1988). An article is "on sale" within the meaning of section 102(b) if even a single article is offered or sold more than one year before the date of application, here August 1, 1991. *In re Caveney*, 761 F.2d 671, 675-76 [226 USPQ 1] (Fed Cir. 1985); *Intel Corp. v. Int'l Trade Comm'n*, 946 F.2d 821, 829-30 [20 USPQ2d 1161] (Fed. Cir. 1991). An article is "in public use" if there has been "any non-secret use of a completed and operative invention in its natural and intended way open to the public or where any member of the public can see it if such a member so desires."[14] 1 Peter D. Rosenberg, Patent Law Fundamentals § 7.07 [1] (1993 rev.).

Once a court has identified the prior art that was in public use or on sale, a court must compare that prior art to the claimed invention. "[A]nticipation requires that each and every element of the claimed invention be disclosed in a prior art reference. In addition, the prior art reference must be enabling, thus placing the allegedly disclosed matter in the possession of the public." *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471 [1 USPQ2d 1241] (Fed. Cir. 1986), *cert. denied*, 482 U.S. 909 (1987).

In the present case, the critical date for determining public use or sale is August 1, 1990, one year before the filing date. As discussed above, the parties have established by clear and convincing evidence the nature of a substantial amount of the prior art that was on sale and in use at that time.

Claim 1 and the dependent claims 2-11 all require a minilight kit with securement elements, an electronic control unit, and flexible wires independently wiring the minilights to the control unit. The prior art includes three types of shirt-minilight assemblages having minilight kits with independent wiring, an electronic control unit, and securement to a garment: the O-ring shirts, the Oberbeck glued shirts, and the Savarese taped shirts.[15]

The first of these, the O-ring shirts, appear to anticipate claim 1. However, the only evidence for these shirts are the unsubstantiated and sketchy descriptions in the Oberbeck and Savarese Declarations. I find that these descriptions do not provide clear and convincing evidence that O-ring securement elements were used in the prior art.

The second type of shirts, the Oberbeck glued shirts, are not within claim 1 as discussed above. Claim 1's securement elements do not read on glue.

The third type of shirt, the Savarese taped-shirt, anticipates claim 1. In addition to the shirts themselves, Sunshine Fun anticipates claim 1 by providing an enabling disclosure of these shirts, including each of the elements of claim 1: a reference to Flora-Lites with their minilights attached by flexible and independent wiring to an electronic control unit, and a reference to securement elements (pieces of tape).

However, it is not clear from the record when Ms. Savarese first displayed her shirt to the public. *See supra* note 4. Since Plaintiffs must prove their case by clear and convincing evidence, I find that the Savarese shirt is not prior art.

In contrast, the record contains clear and convincing evidence that the Sunshine Fun

---

[14] Demonstration of an invention at a trade show or convention is a public use, even if the invention is not offered for sale for several years thereafter. *Electro-Nucleonics, Inc. v. Mossinghoff*, 593 F.Supp. 125, 127 [224 USPQ 435] (D.D.C. 1984); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683-84 [195 USPQ 410] (7th Cir. 1977), *cert. denied*, 435 U.S. 905 [197 USPQ 656] (1978). Furthermore, as quoted above, the invention need only be used "in its natural and intended way." That is, as long as the public use is natural, it need not disclose all the elements of every claim. *Hall v. Macneale*, 107 U.S. 90, 97 (1882) (mechanism for safes exhibited at fairs and sold was "in use" even though it was invisible without dismantling the safe); *Egbert v. Lippmann*, 104 U.S. 333, 336 (1881) (corset springs were in public use even though invisible, where inventor had given two corsets away without restriction on their use); *In re Blaisdell*, 242 F.2d 779 [113 USPQ 289] (C.C.P.A. 1957) (shims put in automobiles on experimental basis were in public use because of their continued and unrestricted use after the end of the experiment).

[15] The Types A-C minilights cannot qualify alone, because they contain neither securement elements nor fasteners.

publication was available to the public prior to August 1, 1990. The record does not actually disclose the date on which Sunshine Fun became available, only that it was published in February of 1990. However, Defendant has asked for reexamination of claim 12 based on the Sunshine Fun February 1990 publication date. (Pls.' Ex. 26 at 32.) In its reexamination request, Defendant admitted to the PTO that "the Sunshine Fun reference qualifies as a prior art reference under both Sections 102(a) and 102(b)." [16] *Id.* Defendant does not now contest this issue and, accordingly, I find that Defendant's acceptance of Sunshine Fun as prior art for the purposes of reexamination constitutes clear and convincing evidence here.

Accordingly, I find that Sunshine Fun is a printed publication that anticipates claim 1.

Claim 2 differs from claim 1 only in that it contains a fastener for the control unit. Sunshine Fun does not disclose a fastener within the meaning of claim 2, since Sunshine Fun discloses only a pocket.

Claim 3 differs from claim 1 only in that it contains an actuation switch. All of the Flora-Lite minilight kits contain actuation switches, and hence Sunshine Fun anticipates claim 3.

Claims 4 and 5 require a multiposition actuation switch, with a "plurality of different actuating modes." These claims do not read on the Flora-Lite kits of record, since these only have simple on-off switches.

Claim 6 requires wires of substantially equal length. All of the Flora-Lite kits of record contain such wires, and hence Sunshine Fun anticipates claim 6.

Claim 7 requires a flasher unit. Flora-Lite kits contained flasher units prior to August 1, 1990, and hence Sunshine Fun anticipates claim 7.

Claim 8 requires LEDs and a power supply. Flora-Lite kits contained LEDs and power supplies prior to August 1, 1990, and hence Sunshine Fun anticipates claim 8.

Claim 9 requires a battery mounted on the control unit, with the control unit housed in a soft-sided case attached to the garment by a fastener. Although this claim may require that the control/power unit be removable, it does not require that the soft case be removable. Accordingly, I find that Sunshine Fun anticipates claim 9. Flora-Lite kits contained control units prior to August 1, 1990, and the pocket described in Sunshine Fun is a soft-sided case attached to the garment with a fastener (glue or thread).

Claim 10 requires a battery mounted on a flat control unit, with the control unit plus battery plus case apparatus presenting a flat profile. The circuit board on Type B minilights is 2 3/16 inches long by 1 inch wide by 1/4 inch deep, giving a four-to-one ratio of width to depth. Accordingly, I find that Type B minilights have substantially flat circuit boards. However, it is not altogether clear that a pocket containing a Type B or C minilight would present a "substantially flat profile." *See supra* note 13 and the accompanying text.

Claim 11 requires O-rings. Sunshine Fun does not disclose O-rings.

Claim 12 is a broad claim, requiring only removably mounted minilights, a central control unit, and independent wiring. Sunshine Fun anticipates this claim.

[3] In summary, I find that Sunshine Fun anticipates claims 1, 3, 6-9, and 12. The O-ring shirts and the Savarese shirt are not prior art because Plaintiffs have not established the dates of their public use or sale by clear and convincing evidence. The Oberbeck shirt does not anticipate the claims because neither of the independent claims, claims 1 and 12, reads on glue as a securement element.

### D. *Obviousness*

The final inquiry is whether the prior art renders any of the claims in the '325 patent obvious. The requirement that a patent be nonobvious is codified in section 103 of Title 35:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. ...

35 U.S.C. § 103.

The question of obviousness is one of law. *Graham v. John Deere*, 383 U.S. 1, 17 [148 USPQ 459] (1966). However, it is a question of law rooted in four factual inquiries: "the scope and content of the prior art, the differences between the prior art and the claimed

---

[16] In its initial application for reexamination, Defendant stated that "Requestor is not sure whether [Sunshine Fun] was published prior to August 1, 1990, but assumes for purposes of this Request that it was." (Pls.' Ex. 26 at 6.) Defendant apparently learned later that the publication date was actually in February of 1990.

invention, the level of ordinary skill at the time the invention was made, and any objective considerations that may be present." *Continental Can Co. U.S.A., Inc. v. Monsanto Co.*, 948 F.2d 1264, 1270 [20 USPQ2d 1746] (Fed. Cir. 1991).

In the present case, the "scope and content" of the prior art is undisputed. It includes the Oberbeck glued shirts, the Sunshine Fun manual, the Types A-C minilights, and the Miller, Shenker, and Beard patents.

Defendant's "objective considerations," such as copying and commercial success, will be accepted as true for the purposes of this motion. To the degree that these objective considerations have a nexus with the merits of the invention, they are probative on the issue of obviousness. *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 719 [21 USPQ 1053] (Fed. Cir. 1991). However, objective considerations are not necessarily determinative. An invention may be obvious even if it enjoys immediate commercial success. *Newell Co., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 [9 USPQ2d 1417] (Fed. Cir. 1988), *cert. denied*, 493 U.S. 814 (1989) (upholding the trial court's J.N.O.V. ruling that the claims were obvious).

The only other factual issue is the level of ordinary skill in the art at the time the invention was made. Relevant factors include "the educational level of the inventor, educational level of those who work in the industry . . . , and the sophistication of technology involved," *Ryko*, 950 F.2d at 719; whether the prior art "fairly suggested the desirability" of the claimed invention, *Continental Can*, 948 F.2d at 1270; and the nature of the problems and their prior solutions. 2 Patent Law Fundamentals § 9.02; *see also Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1051 [5 USPQ2d 1434] (Fed. Cir.), *cert. denied*, 488 U.S. 825 (1988).

The present case does not involve sophisticated technology. The unanticipated claims are novel because they contain the following low-tech features: an unspecified fastener attached to the control unit (claims 2, 9, 10); an unspecified multi-position switch (claims 4-5); a flattened case (claim 10); and O-rings (claim 11). In addition, Defendant asserts that claims 1-11 are unanticipated because they contain unspecified "securement elements" absent from the Types A-C minilights, and that the Types A-C battery packs are bulkier than that described in claim 10.

The record does not show the educational level of Mr. Eisenbraun, or whether he had special skills that transcended the ordinary skills of the art. Given the low-tech nature of the patent, perhaps it is not surprising that the record contains little direct evidence of the qualifications of Mr. Eisenbraun. However, the record does contain considerable evidence of the ordinary skill in the art.

The relevant art, as described above, is the design and implementation of minilight kits suitable for attachment to apparel. Ms. Savarese is an example of one who practiced this art at the time that Eisenbraun invented his minilight kit. She visited industry shows, displayed her products, read industry literature, corresponded with her East Asian suppliers, and sought and adopted innovations such as twinkling minilights and LEDs. She was also aware of the desirability of attaching the minilights removably, and did so using tape and a pocket for the control unit, as described in Sunshine Fun. In other words, Ms. Savarese was a person of moderate sophistication who kept abreast of developments in minilight manufacture and use.

Unlike Ms. Savarese, Ms. Oberbeck was not a participant in the minilight industry. However, Ms. Oberbeck did sell shirt-minilight assemblages, and a person with ordinary skill in the area of designing and manufacturing minilight assemblages would have been aware of much assemblages. Ms. Oberbeck initially attached her minilights with glue, but she too was aware of the desirability of attaching minilights removably. Accordingly, she switched to using a removable velour insert and, at least according to her declaration, velcro. These techniques and ideas were all part of the ordinary skill in the art.

The ordinary skill in the art also included certain of the teachings of the Shenker, Miller, and Beard patents, since each of these taught minilight assemblages for use on apparel. Perhaps the ordinary skill in the art did not include all possible applications of these patents, but the ordinary skill at least included the applications expressly taught by the patents themselves. Among other things, these patents taught various kinds of flasher circuits, various shapes of circuit boards and control/power units, and various methods of attachment including velcro and O-rings. In addition, the Miller and Beard patents show that practitioners of the art had at least basic familiarity with circuit design.

In sum, I find that the ordinary skill in the art included the direct teachings of the Miller and Shenker patents, the sorts of assemblage techniques used by Ms. Oberbeck and described in the Sunshine Fun manual, and at least basic familiarity with electronic circuitry.

The record also contains objective evidence of nonobviousness, in particular the evidence of direct copying, the evidence of a long-felt need for securement elements, and

the evidence that Defendant's new-style kits achieved immediate commercial success. For the purposes of this motion for summary judgment, I must weigh this evidence and draw inferences from it "in the light most favorable to the party opposing the motion." *Whitehead*, 729 F.2d at 251 (quoting *Coastal States Gas Corp. v. Department of Energy*, 644 F.2d 969, 979 (3d Cir. 1981)); *Wahl*, 624 F.2d at 1181.

Defendant first points to Plaintiffs' direct copying as evidence of nonobviousness. If Defendant's invention was obvious, why did Plaintiff follow in Defendant's footsteps rather than lead the way? To analyze this question, it is necessary to compare Plaintiffs' alleged copies with Defendant's original. (*See* Eisenbraun Decl., Exs. A, G, H.) Plaintiffs' copies resemble Defendant's original in that both have ten blinking minilights, both have a two-position (on/off) switch, both have similarly-shaped control/power units, both have LEDs, both have flexible wires about 10 inches long, and both have O-rings. Of these features, Type C minilights anticipated all but the O-rings, the 10-inch wires (Type C had 20-inch wires), and the shape of the control/power unit.

Defendant next points to the commercial success of Lightables. Defendant sold 10,000 units of old-style minilights in 1989, and 64,000 units in 1990. However, after Defendant introduced Lightables in early 1991, the old-style sales declined to 21,000 in that year and to 10,000 in 1992, whereas sales of Lightables burgeoned to 176,000 units in 1991 and 663,000 in 1992. Defendant also notes that Plaintiffs appear to be doing passably well with their new-style copies.

Defendant attributes the success of new-style minilights to their flat, light control/power units made possible by their small batteries; to their short, flexible wires; to their use of LEDs instead of incandescent bulbs; and to the ease of mounting the minilights on garments. However, Type C minilights had flexible wires as short as twenty inches, Type C minilights used LEDs, and Type C minilights could easily be mounted on garments using tape. Thus, Defendant must argue that the combination of shorter wires, lighter control/power units, and O-rings is responsible for much of the success of the new-style minilights.

Finally, the record holds at least some evidence that there was a long-felt need for convenient, removable securement elements for the minilights. The industry had apparently not yet settled on a single method of attachment — glue, tape, O-rings, velcro, flanges, and other adhesives had all been described or in use. However, the record holds no evidence, other than Plaintiffs' alleged copying, that O-rings satisfy that long-felt need. Indeed, the Shenker patent suggests that *any* independent securement element, O-ring or otherwise, is inferior to the securement element described therein.

Considering all of this evidence together, I find that each of Defendant's claimed innovations was obvious, and each combination including these innovations was obvious.

To begin with, claim 1 would have been obvious even if "securement element" did not read on tape. Claim 1 is simply a Flora-Lite minilight with a securement element. The need for some sort of securement was obvious, as shown by the prior use of tape, glue, O-rings (Shenker patent), flanges (Shenker patent), velcro (Miller patent), and "adhesive" (Miller patent). That two of the above list attach to each individual minilight (or the wire at its base) indicates that individualized securement elements were obvious. That the Shenker patent discloses a securement element exactly fitting Defendant's preferred embodiment, used in exactly the same way, indicates that even Defendant's restrictive construction of claim 1 was obvious.

Claim 2 is just claim 1 with a fastener attached to the control unit. Many well-known fasteners have the property that they attach to the thing to be fastened. One such fastener is, of course, velcro, a material hardly new to the clothing accessory business. In addition, it appears that velcro has already been used for various attachment purposes in the minilight industry (Oberbeck shirts, Miller patent). Thus, I find that claim 2 was obvious.

Claim 3 is obvious because it is just claim 1 with an on-off switch, like that in the Flora-Lites.

Claim 4 is just claim 1 with a multiposition actuation switch mounted to the control unit. A multiposition switch was an unsophisticated concept, and would have been obvious to anyone who recognized that different flashing modes were desirable. As shown by the Miller and Beard patents and by Types B and C minilights, the desirability of various flashing modes was common knowledge. Given the desirability of various flashing modes, the desirability of putting several in a single unit would have been obvious. And if it was obvious to put several modes in a single unit, it would have been obvious to select the modes using a multiposition switch.

Claim 5 is just claim 1 with a twinkle and a constant-illumination position. This claim is obvious for the same reasons as claim 4.

Claim 6 is just claim 1 with equal-length wires, and is obvious because claim 1 is obvious and because the prior art had equal-length wires (Types A-C).

Claim 7 is just claim 1 with a flasher, and is obvious because claim 1 is obvious and because the prior art had flashers (Types B and C, Miller and Beard patents).

Claim 8 is just claim 1 with LEDs and a power supply, and is obvious because claim 1 is obvious and because the prior art had LEDs and power supplies (Type C, Shenker and Beard patents).

Claim 9 is just claim 1 with LEDs, a battery pack, and a control unit housed in a soft-sided case with a fastener to attach it to the garment. LEDs and battery packs were obvious and well-known in the industry. Even if the Sunshine Fun pocket is not a soft-sided case, a fabric case would have been an obvious innovation to those manufacturing or selling devices for the garment industry. Fasteners are obvious for the reasons given in claim 2.

Claim 10 is just claim 9 with a battery mounted on a circuit board to give a control/power unit with a "substantially flat profile." A flat control/power unit was obvious, as shown by Flora-Lite's Type A flat control/power unit and by the Miller patent's flat power supply. Furthermore, the advantages of an unobtrusive control unit would have been apparent to anyone concerned with producing accessories for clothing. To the degree that Lightables improve on the prior art with regard to unobtrusiveness, they do so only because they employ smaller batteries, and not because flatness is nonobvious.

Claim 11 is the most difficult. Securement elements are clearly desirable, and the record lacks clear and convincing evidence that O-rings were in public use or on sale. Nonetheless, I find that O-rings were obvious. O-rings are well-known items and, more importantly, the Shenker patent disclosed O-rings used exactly as described in claim 11. I find that, in light of the Shenker patent, using O-rings as securement elements is obvious.

Claim 12, the broadest claim, is obvious for the same reasons that the narrower claims are obvious.

[4] In sum, the record holds sufficient evidence to conclude that the '325 patent is invalid for obviousness. The objective evidence of copying, commercial success, and long-felt need does not alter this conclusion. To begin with, evidence of copying is not conclusive proof of nonobviousness — a person can copy an obvious feature just as easily as a nonobvious one. Copying is especially inconclusive where, as here, external forces dictate the nature of the copied features. For example, the size of the batteries and the need for inconspicuousness dictate the size and shape of the control/power unit. The least conspicuous shape, given the realities of printed circuit boards and batteries, is one that will lie flat against a shirt without producing conspicuous bulges.

Similarly, commercial success is not conclusive evidence of nonobviousness. Even if I assume that the commercial success of Lightables was wholly due to their novel combinations of features, I find that the record holds clear and convincing evidence that these combinations were obvious. However, on the present record, it is far from certain that Lightables' commercial success is wholly due to their novel combination of features.[17] Moreover, the evidence of long-felt need for securement devices, and possible satisfaction of that need by O-rings, does not outweigh the Shenker patent's clear teachings on O-ring securement elements.

Although the objective evidence in the present case is not insubstantial, it cannot negate the evidence of the prior art and the ordinary skill in that art. In this regard, the present case resembles *Newell,* where the court held that "although the record shows a highly successful product, the record also establishes such a strong case of obviousness based on admissions and the teachings of the prior art ... that the objective evidence of nonobviousness does not persuade us to reach a contrary conclusion." 864 F.2d at 769; *see also EWP Corp. v. Reliance Universal Inc.,* 755 F.2d 898, 907 [225 USPQ 20] (Fed. Cir.), *cert. denied,* 474 U.S. 843 (1985) (finding obviousness despite a showing of

---

[17] The record contains no evidence, other than Mr. Eisenbraun's assertions, that there is any nexus between the claimed innovations and Lightables' commercial success. It may be that there are other explanations for Lightables' success. For example, Lightables may have succeeded not because they improved on the prior art, but because they improved on Defendant's old-style minilights. Lightables differed from Defendant's old-style minilights in several ways, most notably in their easy adaptation to different patterns. In this regard, Defendant's old-style minilights were quite backward, since the prior art had known freely-positionable minilights for some time. Thus, the jump in sales of Defendant's new-style minilights may have been due to the inferiority of Defendant's old-style minilights.

Interestingly, the sales of Flora-Lite's and Darice's alleged copies do not appear to have increased as dramatically as the sales of Lightables. If Flora-Lite and Darice were already selling products comparable to Lightables, then their more-modest sales increase is understandable.

commercial success). Plaintiffs have presented clear and convincing evidence of obviousness, and Defendants have failed to demonstrate any material issues of fact.

Consequently, I find that all of the claims of the '325 patent were obvious despite the objective evidence offered by Defendant. Of course, the patent examiner reached a different result. But the patent examiner had no opportunity to consider Sunshine Fun, the Savarese shirt, Oberbeck shirts, Types A-C minilights, or any of Plaintiffs' other exhibits of record. Had the examiner been shown the evidence now before me, I am confident that he never would have issued the '325 patent.

## IV. CONCLUSIONS

Plaintiffs' motion for partial summary judgment is granted, and Defendant's request for a stay is denied. I find that each claim of the '325 patent is invalid. Claims 1, 3, 6-9, and 12 are invalid because they were anticipated, and all of the claims are invalid because they were obvious. An appropriate order shall issue.

---

**District Court, M.D. Florida**

NEXxUS Products Co. v. Gentle Concepts Inc.

No. 87-1152-CIV-T-15

Decided April 26, 1993

### TRADEMARKS AND UNFAIR TRADE PRACTICES

**1. Types of marks — Arbitrary or fanciful — Particular marks (§327.0803)**

Plaintiff's "Nexxus" marks, for hair care products, are arbitrary.

**2. Infringement; conflicts between marks — Likelihood of confusion — Particular marks — Confusion likely (§335.0304.03)**

Confusion is likely between plaintiff's "Nexxus" marks, for hair care products, and defendant's "Classics" marks, also for hair care products, since defendant's products prominently display plaintiff's marks in way that suggests to public that "Classics" products are associated with "Nexxus" product line, since parties' products are very similar and sold to same users, although they are sold via different outlets, since defendant explicitly refers to "Nexxus" in its advertising, since defendant developed and marketed its products with willful and deliberate intent to benefit from plaintiff's reputation, and since there is substantial evidence of actual confusion.

### REMEDIES

**3. Monetary — Damages — Personal liability of corporate officials (§510.0513)**

Evidence showing that officers and directors of corporate trademark infringement defendants were active and conscious force behind infringing activity, and that they actively and knowingly caused infringements, warrants finding that such individuals are personally liable.

### TRADEMARKS AND UNFAIR TRADE PRACTICES

**4. Types of marks — Trade dress as mark — Labeling and appearance of goods (§327.0704)**

**Types of marks — Trade dress as mark — Functionality (§327.0706)**

Combination of bottle shape, color scheme, and distinctive style of printing used for trade dress of plaintiff's "Nexxus" hair care products creates trade dress that is inherently distinctive, and features of such trade dress are not functional, since there are many forms that will accommodate functions of shampoo or conditioner bottle.

**5. Infringement; conflicts between marks — Likelihood of confusion — Particular marks — Confusion likely (§335.0304.03)**

**Infringement; conflicts between marks — Passing off (§335.07)**

Confusion is likely between trade dress of plaintiff's "Nexxus" hair care products and trade dress of defendant's "Classics" hair care products.

**6. Infringement; conflicts between marks — Dilution (§335.05)**

Defendant's use of "Classics" marks for its hair care products, which are confusingly similar to plaintiff's "Nexxus" marks for hair care products, violates Florida anti-dilution statute, Fla. Stat. Ann. 495.151.

### REMEDIES

**7. Non-monetary and injunctive — Equitable relief — Seizure; forfeiture (§505.0703)**

Order issued pursuant to 15 USC 1118 that would require defendants' infringing