TimeBase Pty Ltd. v. Thomson Corporation, The et al                                    Doc. 29 Att. 4

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

------------------------------------------------------------

Timebase Pty, Ltd.,

        Plaintiff,

  vs.                         Case No. 07-4551

The Thomson Corporation,

        Defendant.

------------------------------------------------------------


THE HONORABLE JEANNE J. GRAHAM

United States Magistrate Judge


\* \* \*

TRANSCRIPT OF PROCEEDINGS

\* \* \*


Date: January 24, 2008

Reporter: Leslie Pingley


(651) 681-8550 phone   1-877-681-8550 toll free
www.johnsonreporting.com

Exhibit 4

Dockets.Justia.com

1  APPEARANCES
2
3
4  MR. JOSEPH N. HOSTENY, Attorney at Law,
5  181 West Madison Street, Suite 4600, Chicago, Illinois
6  60602 appeared on behalf of named Plaintiff.
7
8
9  MR. MICHAEL R. CUNNINGHAM, Attorney at
10  Law, 80 South Eight Street, Suite 500, Minneapolis,
11  Minnesota 55402 appeared on behalf of named Plaintiff.
12
13
14  MR. CALVIN L. LITSEY and MR. SHAWN T.
15  GORDON, Attorneys at Law, 90 South Seventh Street,
16  Suite 2200, Minneapolis, Minnesota 55402 appeared on
17  behalf of named Defendant.

1  PROCEEDINGS
2
3  (NO REPORTER WAS PRESENT - The following
4  transcript was prepared from a COPY of the
5  original court tape)
6
7  THE COURT: This is the matter of
8  Timebase vs. Thomson Corporation, et.al. Civil
9  File No. 07-4551. It's assigned to District
10  Court Judge Joan Ericksen and myself, Jeanne
11  Graham, as Magistrate Judge.
12  We're here today on Defendant's motion to
13  consolidate with Case No. 07-1687 and to stay the
14  proceedings.
15  May I have appearances please, first from
16  plaintiff's side.
17  MR. CUNNINGHAM: Your Honor, my name
18  is Michael Cunningham and with me this morning is
19  Joseph Hosteny. He will be making the
20  presentation on behalf of the Plaintiffs.
21  THE COURT: Okay. Great. Thank you,
22  good morning. And the defense?
23  MR. LITSEY: Good morning, Your
24  Honor. Calvin Litsey from Faegre & Benson
25  representing the Defendants.

1  With me at counsel table are Shawn Gordon
2  also from Faegre & Benson and Mark
3  (Unintelligible) from the Thomson Corporation.
4  THE COURT: Great. Good morning.
5  All right. You will have about 25 minutes a
6  piece if you need that, so go ahead defense.
7  MR. LITSEY: Thank you, good
8  morning, Your Honor.
9  At the outset I have a couple of pages of
10  demonstratives in one case that I may be
11  referring to during the course of my argument and
12  wanted to provide the Court and counsel with
13  copies of those now if I may.
14  THE COURT: Okay. Go ahead.
15  MR. LITSEY: Thank you. The
16  question before the Court today, Your Honor, is
17  whether as a matter of this Court's management of
18  it's docket it makes sense to proceed with this
19  second case right away, so we proceed out of the
20  starting gates with this case, whether we wait as
21  a matter of efficiency and trying to impose the
22  least burden on the Court and the parties and see
23  what happens with the re-exam in the first case
24  and then at that time go forward with a single
25  scheduling order.

1  We believe that the factors that this
2  Court considered just last summer strongly
3  support a stay here as well.
4  As the Court may recall, Timebase brought
5  a lawsuit last year on the 592 patent, which I am
6  going to refer to as the parent patent or the
7  original patent this morning, against the three
8  Thomson Companies, also the ones that have been
9  sued here.
10  A third party sought to have that patent
11  re-examined in the patent office and the patent
12  office agreed to do that finding that there was
13  substantial question of patentability and then we
14  moved for a stay in your Court. The Court
15  analyzing the three common factors that Courts
16  look at concluded it was the right decision under
17  the circumstances, so we have that case stayed.
18  Now, Timebase apparently also somewhat
19  later in the 2000 time period had filed an
20  application for a different patent. That patent
21  application frankly floundered in the patent
22  office for a number of years, about six years
23  actually, when Timebase decided it would change
24  the invention that it was trying to claim in that
25  application and to tie it to this parent

Page 6

application that's now in the re-exam, so it linked that patent to the patent in the re-exam.

And here's where my first very basic exhibit comes in to play, Your Honor, which is basically this blow up and some markings of the specifications from the two patents and I don't expect the Court to read it or I would have supplied magnifying glasses, I guess, but it's a very, very simple point I wanted to make with this, Your Honor, and that is as follows: The patent on the left is the patent in the first case which is this 592 patent and what we have reproduced here is the specification from that patent. And as you can see that what happened with respect to the second patent, the 228 patent, is that Timebase's prosecution attorneys added all of the invention disclosure from this first patent in to this second patent and just the basic, basic point, Your Honor, is that these are extremely related patents.

The claims that are at issue in this case that we're discussing today are all based on and claim priority to this same invention that's disclosed in all this yellow stuff, so the very simple point is that these are extremely related.

Page 7

One is the parent and you can think of the other as the child patent and it is for that reason that there are some issues that come in to play when we get into the equities of whether or not a stay is appropriate here or not.

Since we now are faced with this second patent in this lawsuit, the question is how should this case be managed and once again we turn to the three factors that this Court considered last summer.

No. 1, would there be undue prejudice to the plaintiff if there were consolidation and a stay and we're not talking about whether the plaintiff would be annoyed or not, whether it might suffer some prejudice. The question is would there be undue prejudice to the plaintiff.

Second, would there be a simplification of the issues. Would there be judicial economy, not whether the case would go away entirely, not whether we would eliminate every single issue, but as a matter of case management does it make sense to eliminate some issues and eliminate efficiency -- inefficiencies.

Third, where are we in the case? Are we at the early stage or are we bumping up against a

Page 8

trial.

We believe that nothing has changed since last summer to warrant the approach adopted by the Court as it addressed each of these factors and that they each strongly support a stay. Let me just take them one at a time. I am going to start with the last one first so I am going in reverse order because I think the last one is the easiest frankly and probably in the least dispute and that is we're at the earliest stages of the litigation. Literally nothing has happened other than the filing of the complaint, the filing of an answer and the filing of this motion. There's been no scheduling conference, no schedule has been issued, the parties haven't engaged in discovery and I think as this Court concluded and as Judge Ericksen and Magistrate Judge Nelson did in the VData case, when you're at this stage of the proceedings it's much more likely that these kinds of stays are routinely granted, so therefore this factor weighs in favor of granting a stay of the second case in consolidating it with the first case.

Let me turn to the middle factor, that is a factor all about efficiencies, simplification

Page 9

of the issues and docket management. The test once again is not as Timebase seems to suggest whether the case would go away if we stayed this case, it would eventually go away or whether we would eliminate every single question.

The question is whether we would simplify issues, whether it would be more economical to the parties, less burdensome to this Court and whether there are some substantial inefficiencies that we might avoid and it's those inefficiencies that I want to address and I am just going to take them one at a time and go through them slowly, and for lack of better names, I am going to call the first inefficiency having to do things over. That's one inefficiency and the second one is we have two cases rather than one and what kinds of problems does that create.

Let me start with the first inefficiency which is having to do things over. Because of the relationship between these two patents, Your Honor, because they are tied together, because they are linked, the Federal circuit has made very clear that what happens in the patent office proceeding on the re-exam affects this patent. It affects the scope of it's patent. It affects

3 (Pages 6 to 9)

1  the nature of the claims in the patent,
2  statements that Timebase makes in that proceeding
3  bind it with respect to this second patent.
4         And the main point here is that as long
5  as this proceeding is going on with respect to
6  the 592 patent, we essentially have a patent in
7  flux. It's not a patent whose scope has been
8  finally determined because it could change based
9  on positions Timebase takes, based on arguments
10 it makes in response to actions taken by the
11 patent office.
12        So as a result of this there is the
13 potential that if this case right now is not
14 stayed we would end up redoing certain things.
15 What do I mean by that? Let me give you an
16 example. One of the things we'll have to do in
17 this case is proceed with claim construction, go
18 to a Markman Hearing and so forth. I'm sure the
19 Court is familiar with all the steps that go
20 through. The parties select claim terms. They
21 come up with arguments as to how those terms
22 could be construed. They file briefs. They will
23 present them to Magistrate -- I'm sorry, to Judge
24 Ericksen in this case. On that she'll hold a
25 Markman Hearing and eventually issue an order and

1  she'll write an opinion based on the party's
2  understanding of what those claim terms mean at
3  that time and based on the arguments that are
4  made at that time.
5         If two months after we have gone through
6  that entire process Timebase in response to
7  arguments in the patent office suddenly says in
8  order to overcome some of this prior art, you
9  know what, what we really meant by this term is
10 this, so now we're changing this or we agree that
11 we now have to limit our invention in this way
12 and seek an amendment, all of that is binding on
13 it in the case that we would have gone forward
14 on. All of that would then change the potential
15 for having to go through and essentially redo one
16 or more claim constructions, so that is the sort
17 of having to do things over problem that can
18 result as a result of having this case go forward
19 while the re-exam proceeding continues.
20        And if you look at my second basic
21 demonstrative, again these are sort of crude, but
22 I tried to put down a number of sort of common
23 litigation steps. You could probably chose
24 others, but they are pretty common with respect
25 to most patent proceedings and the main point is

1  as you go through these kinds of steps way down
2  in the lower right hand corner, the potential
3  inefficiency here is having to redo one or more
4  of these. I gave the claim construction issue,
5  but there could be other kinds of examples as
6  well. For example, different prior art might
7  become relevant that really wasn't before because
8  of changes in the position that Timebase has
9  made.
10        But the basic point is until the re-exam
11 issues are settled, we have a patent that is in
12 flux.
13        Now, what's the likelihood of any of
14 these things happening, none of us can predict.
15 I'm sure that there could be substantial
16 arguments, there could be substantial changes
17 that occur in the proceedings before the patent
18 office. There could be just a few. There could
19 be none at all.
20        The point is that none of us know at this
21 point in time, and all of us -- but the risk of
22 having to substantially redo one or more of these
23 activities exists so long as that patent is in
24 flux.
25        Now, Timebase may argue, well, it's

1  pretty unlikely that that's going to happen
2  because, look, the prior art that's in this
3  proceeding now, we just got that patent issued
4  over that. Well, you can make arguments all
5  sorts of different ways there. No one knows how
6  carefully that examiner really looked at those.
7  Those were submitted after he had already granted
8  an allowance and they were put in with a whole
9  bunch of other art. You know, we can presume he
10 did, but nobody really knows how they operate.
11        This examiner we know already has decided
12 there's a substantial question of patentability.
13        The European patent office on this same
14 prior art has rejected these same sorts of claims
15 entirely. Timebase can't even get a patent in
16 Europe based on this, so there's kind of a wide
17 range of speculation here that we can all come up
18 with our own as to what that might be, but the
19 point is there's at least some possibility, if
20 not a reasonable probability, that what happens
21 in the patent office and in these proceedings is
22 going to affect the claims, the nature, the scope
23 of the invention and that presents the
24 possibility of this huge inefficiency of having
25 to do redo things and really change the entire

landscape because it's really the claims and the nature of the invention that drive the whole litigation in terms of what prior art you're looking for, who you're going to depose, what subpoenas you send out, what arguments you make about infringement and non-infringement, damages, all those sorts of things.

So that's the one inefficiency that I think having to do things over inefficiency that would be eliminated if we waited, if we waited with this case, and went forward all in one piece after the re-exam took place.

The second inefficiency is really the fact that we have two cases rather than one and I have just tried to show that again on this demonstrative by saying, look, at the top you combine these cases, you go through these things once. You have one scheduling order, one protective order. You deal with documents. You deal with written discovery all at once. You don't -- not every one of these things might be inefficient or you might have -- might not have complete duplicativeness on all of these, but having to go forward twice, there's this transaction cost even if the content of a number

of these things are the same, just the transaction cost of having to go through two hearings, appearing in court twice, all those sorts of things, identifying experts twice, is an inefficiency and it can become pretty significant.

Let me give you an example. Just take the case of a deposition. If we proceed with this second case we will be taking the depositions of the four inventors. They are down in Australia. Whether we have to proceed pursuant to the Hague Convention or not, I don't know, I guess it depends on whether Timebase makes them available or not, but we will have prepared, gone down, taken four depositions of inventors in Australia.

Meanwhile, sometime later if this case is not stayed and assuming the other case goes forward, we will have to some months later fly down to Australia, depose three inventors, two of whom are identical and the same and have to go through that whole procedure again.

Now, there's great expense associated with all of that, but it also raises the possibility of kinds of disputes that all of us,

and especially I'm sure this Court would like to avoid, that is we do the second set of depositions. Are there going to be objections about whether we get to do them at all because they were deposed once before in this other case. Are there going to be objections about you can't ask that question again because you answered -- asked it in the other deposition. What if we had a 30(b)(6) deposition on a particular topic and then months later we're in the second case, we want to do it on that topic, are there going to be arguments about whether we get to do it at all or whether we exhausted our opportunity. There are all sorts of complex, thorny issues that could arise and potential disputes between the parties that would burden this Court, all of which could be avoided or minimized by managing these cases together.

So that exactly is what Judge Frank looked at in the Pacesetter case and that's the case I have handed up to the Court as the last demonstrative. We talked about this, I think, last summer but it's really a very similar situation. It's not an identical situation, but it's a very similar situation that he was dealing

with. He had one case, not two, but the argument was let's go ahead with these two patents while these other two are in re-exam. And you may recall that in the Pacesetter case these patents were unrelated. He goes on to say, you know, these aren't even related unlike the case here so he's really just dealing with this having to do things twice inefficiency and he concluded it doesn't make sense to do that and I just kind of highlighted some of the language where he talks about that. He says, you know, even though only two of these are in re-exam and even though these other two patents are unrelated, they are really inextricably intertwined. You're really talking about the same technology. You are going to have many of the same witnesses, same documents and so forth and he says, you know, quote, there's no discernible demarkation of issues, experts or products, in addition duplicity and overlap will occur when addressing issues such as experts, discovery, damages and products and that's exactly the sort of situation that we have here.

Judge Ericksen actually took a similar approach in approving Magistrate Judge Nelson's order in the VData case. It's a little more

1  settle there because one was in re-exam.  They
2  had tried to get the other one in to re-exam and
3  she said, you know, it doesn't really matter
4  whether this other one goes into re-exam or not,
5  I am not going to proceed with it.  It's not
6  efficient to do it that way.
7         So in short, Your Honor, in terms of
8  simplifying the issues, minimizing the costs and
9  the burdens to the Court and to the parties we
10 think weighs heavily in favor of let's wait,
11 let's grant a stay, let's allow these cases to
12 move forward together simultaneously.
13        Finally, Your Honor, on the last factor,
14 Timebase hasn't shown and they really can't show
15 that they are going to incur any undue prejudice
16 if they are required to wait for these two cases
17 to go forward.  The situation hasn't changed
18 since last summer when this Court found that
19 there would be no undue prejudice to Timebase.
20 Timebase's ownership may or may not have changed.
21 That really seems pretty murky in the record as
22 to actually who owns them, but it's still a
23 company based in Australia.  It has no presence
24 in the United States.  It still doesn't sell
25 here.  It still doesn't have any employees, still

1  has no facilities.  It's not in the market here.
2  It's not doing anything in the way of sales of
3  products.  It's not competing in any way with the
4  defendants.  None of this has changed from last
5  summer.
6         Under these circumstances, they are not
7  going to be entitled to show that they are
8  entitled to any sort of injunctive relief.  They
9  are going to be seeking damages.  They will be
10 seeking damages in the form of a reasonable
11 royalty based on sales of defendant's products
12 and probably try to get pre-judgment interest
13 based on that as well and as Judge Ericksen noted
14 in VData and as this Court found last summer,
15 that's not undue prejudice.  When you get
16 compensated and damages there simply is no
17 prejudice to Timebase in these circumstances and
18 nothing has changed since last summer.
19        The only thing I have noted in their
20 papers was that they now speculate that they
21 would somehow suffer, I think is what they are
22 saying, some unspecified prejudice because if
23 they don't get a fast win here in this case the
24 opportunities to license the technology covered
25 by the patent to certain companies that they

1  don't identify will be hampered.
2         Well, first of all, there's absolutely
3  nothing in the record to support this.  In other
4  words, they haven't come forward with an
5  affidavit, a declaration from any company who has
6  provided testimony in this case that says, you
7  know what, we have actually refused to take a
8  license in this case because we're concerned that
9  this litigation is not going to move fast enough
10 so that we don't want to be hung out there in
11 some sort -- in some sort of nowhere land.
12        This sort speculative contention where
13 there's no evidentiary support in the record is
14 nothing more than speculation.
15        If one were to speculate one could
16 easily -- equally plausibly argue that the reason
17 why no one has taken a license in the last seven
18 years since this patent or the original patent
19 has been out is because nobody agrees that
20 there's innovation having to do with this product
21 or people think the patent is invalid.  That's an
22 equally speculative statement to make.
23        The fact that Timebase would like to
24 secure a victory sooner rather than later, that's
25 not a form of undue prejudice.  That's something

1  that exists in every case.  Everybody wants that.
2  No court has ever held and they don't cite a
3  single case to support the contention that this
4  sort of novel speculation is the sort of undue
5  prejudice that gets factored into a stay or not.
6         Courts aren't in the business of
7  advancing one party's economic agenda over
8  another's.
9         The issue here is how do you best manage
10 the Court's docket and figure out what is the
11 most efficient way to proceed.  It may not be
12 possible to strike the perfect balance between
13 the parties in any given case and there's no
14 question that equities can weigh in different
15 ways, but if one analyzes the same factors that
16 this Court did last summer, they strongly support
17 a stay here.
18        We're at the very beginning of the case.
19 Nothing has happened.  There's no doubt that if
20 you -- if the parties wait, the Court waits and
21 we proceed together in a single scheduling order
22 you eliminate the potential prejudice of having
23 to redo things over while this whole patent
24 proceeding is in flux, while the scope of the
25 patent in this very case is in flux.  You don't

have the problem of having to redo things twice by having two separate lawsuits proceeding even though there's going to be great overlap, you're going to be doing things twice in different proceedings and you're going to have arguments about what you can and cannot do based on what you did the first time. All of that gets eliminated if there's a stay here.

So, Your Honor, since we're at the earliest stage of the proceedings, since we would be minimizing these huge potential ineffiencies if the cases are allowed to proceed together under one scheduling order, we ask that the Court grant our motion.

The parties can continue to report to the Court and we'll try and do a thorough and better job every six months and obviously if something changes, if there's some remarkable change, whatever, either party is free to petition the Court for a change, so that's -- none of this is set in stone, but certainly at this stage, whether it's going to be three months from now we get action in the patent office, whether it's six months, nine months, the fact is whenever that happens the reasons for staying it still make

sense. The reason for proceeding together still makes sense and as I said as long as there is compensation and damages for Timebase at the end of the day there simply is no undue prejudice.

THE COURT: Okay.

MR. LITSEY: Thank you, Your Honor.

THE COURT: I have a couple of questions.

MR. LITSEY: Sure.

THE COURT: One I will just take from something that you just said and that is if there is a remarkable change. Well, it wasn't a remarkable change that the 228 patent that considered the prior art references that, you know, that are part of the re-examination of 592, isn't that a pretty remarkable change that they all looked at and they went ahead with the 228 patent? I know you mentioned -- you touched on this, but I do think we need to address that a little bit more, if they considered the same prior art as in the re-examination, isn't that a pretty good signal about what's going to happen in the re-examination?

MR. LITSEY: I don't think so, Your Honor, for this reason, and again we can all

speculate and sort of lay the odds differently, the fact of the matter is we don't know what that examiner did, how he considered it.

Timebase sat on that prior art on at least two of the references for four years. They could have brought this prior art in the 228 case and even in the other case much earlier, was aware of them from the European patent office proceedings. It waited until after it had completely changed it's patent, the one we're talking about now is the one at issue in this case, and it completely changed it.

The examiner allowed the patent. Then they bring forward additional prior art. Now, it's not an uncommon tactic for patent prosecutors to do that, but the odds of a prosecutor changing their mind or the patent office changing it's mind, an examiner, after he's already allowed something tends to be a little more remote once they have made that decision and then there's a lot of additional art that gets, I won't say dumped in, because, you know, I think there were 15 references or something the first time and then they added more later, but, you know, how carefully he considered

it, whether he said, you know, I am not going to worry about it because it's in re-exam, maybe they'll sort it out there. Who knows. I'm speculating, you know, any of us would be speculating.

THE COURT: Did you just say that the -- say that again, that the patent was issued and then the prior art -- is this related to the -- explain what you just said.

MR. LITSEY: Sure, sure. What happened was the patent was allowed. It wasn't issued yet, but the examiner said I am going to go ahead and I am going to allow this and then before it was issued, I'm not sure, Timebase could have paid like it's issuance fee and just said go ahead, great, but they said no, wait, we want to get this additional prior art in.

THE COURT: That's when they pulled back and submitted the prior art?

MR. LITSEY: Correct.

THE COURT: And then it did issue in November?

MR. LITSEY: Correct, right.

THE COURT: Okay.

MR. LITSEY: And they are trying to

Page 26

    make a virtue out of that and I'm trying to say
    they really shouldn't be so virtuous about that
    because they actually sat on two of the
    references for four years.
        The second point is none of it's binding.
    None of that is binding, you know, on what the
    examiner in the --
        THE COURT: Do you have -- when you
    have a situation like this, is it the same
    examiner or is it --
        MR. LITSEY: It's a different
    examiner and, you know, supposedly the examiners
    who do the re-exams are supposed to be more
    senior kinds of people and so forth. You know,
    whether that's true in this case or not, I
    haven't looked at the particular experience of
    each of these examiners.
        As I said before, one could equally argue
    it's just as likely or plausible that the -- this
    examiner and the re-exam proceeding is going to
    agree with what the European patent office did.
    They've rejected all these claims. They don't
    have a patent. Timebase doesn't have a patent in
    Europe, but based on these same references, these
    same three references which they knew about for a

Page 27

    number of years and were brought to their
    attention by the European patent office.
        So, you know, we don't know, again, the
    timing of this is sort of in flux. If we all
    knew three months from now we'd get word there
    would be some action in the patent office. I
    think everybody is surprised that nothing has
    happened in the course of a year. I think we
    both cite different statistics on kind of
    average, that we take the median and it's like --
    a little over 17 months, 17 and a half months.
    They've cited statistics about the average which
    is more like 22 months so whether we're, you
    know, two-thirds of the way along or only half or
    a quarter, who knows. I mean things are -- I'm
    sure there's more a back log in the patent office
    than there has been in the past too. We just
    don't now.
        They are supposed to be moving
    expeditiously as we reported in our second letter
    of the Court to try to be a little more specific
    about how all that works. They are supposed to,
    because it's in litigation and so forth, that's
    supposed to be like at the top of their list so
    we can hope and trust that they will be dealing

Page 28

    with it soon. How soon we don't know, but I
    would say that the decision by that examiner will
    be made independently of whatever decision the
    European patent office has made and whatever
    decision the examiner on the 228 patent has made.
        And remember the claims in the 228 patent
    are slightly different. They did try to add some
    things in about screen shots and that sort of
    thing, so they are a little different in that
    way.
        THE COURT: And besides the ones
    that we all know from this District, do you know
    of any other case where the stay -- this one
    seems to be a little bit different. I suppose
    Pacesetter involved some patents where the prior
    art had already been examined, but the other one
    by Judge Nelson, weren't they both in
    re-examination at that time?
        MR. LITSEY: I think at the time of
    the issuance of the opinion I don't remember what
    the subsequent proceeding or what actually
    happened, but at the time of the opinion one was
    in re-exam and somebody had asked to put the
    other one in re-exam, but it wasn't yet in
    re-exam, so -- but judge -- Magistrate Judge

Page 29

    Nelson recommended to Judge Ericksen and she
    accepted the recommendation that that second
    patent not go forward even though it wasn't in
    re-examination.
        I think Pacesetter is very, very similar
    to this case. I mean it's just -- it's basically
    the same thing except it's happening in one case
    and he decided let's not split them in two.
    Let's keep them in one and we're here, I guess,
    Your Honor, would have to decide whether to go
    forward and have them split or keep them together
    as one.
        THE COURT: That would be my last
    question to you. Everyone has talked about
    either we stop them both or one goes forward and
    one doesn't. What if we just say that the
    remarkable change was the 228 patent was issued
    and so now we're just going to start them both up
    again?
        MR. LITSEY: Well, I think for all
    the reasons Your Honor decided last summer that
    wasn't a good idea would apply here the same. I
    mean all of these cases that deal with why you
    wait when you have a re-exam is because
    everything is in flux. You're going to have all

8 (Pages 26 to 29)

1  this potential to redo things. The whole claim
2  construction process can hardly go forward when
3  that's -- when that's happening.
4         THE COURT: Okay. And I guess that's
5  kind of what I really want to focus on a little
6  bit here just for a few minutes and that is
7  wouldn't -- so in looking at this now, where we
8  are now versus where we were last summer, it's
9  not -- couldn't you always have -- our District
10 seems to be that we tend to consider the stay
11 process and maybe for the very reasons that you
12 talked about, but couldn't it always be that
13 someone gives a call and gets the re-examination
14 process going and then we run and we try to get a
15 stay and so particularly in a technology field
16 where today is, you know, almost obsolete and
17 tomorrow certainly will be, you know, doesn't
18 that always then favor, when you talked about not
19 favoring one side or the other, I completely
20 argue with you, but doesn't that always favor the
21 defense when someone is trying to get, you know,
22 relief from what they say is in fringing, if that
23 is the think? If you can always say you have a
24 stay when you re-exam, isn't that always a
25 potential here of kind of just never having a

1  case that really makes it through? I don't know.
2  Honestly I'm not sure what your answer is
3  going to be. I'm not even sure the District
4  Court is the best place to figure those things
5  out anyway. Maybe it is the patent office, but
6  talk to me a little bit about that.
7         MR. LITSEY: Let me comment on that.
8  I think there's a couple of things. One is that
9  the United States Congress in it's infinite
10 wisdom has seen fit to allow both kinds of
11 proceedings. There's the argument they make
12 about two bites at the apple. Judge Ericksen
13 specifically rejects. She said look, you have a
14 process that's setup. It's legitimate for
15 parties, and remember we're not the party seeking
16 the re-exam, we'd prefer to make all our
17 arguments in court, but somebody has gone forward
18 with a re-exam process and they are entitled to
19 do that and while that happens then it does put a
20 burden on the Court if there's litigation and
21 that's why you look at the three factors.
22 There's one, two, three, so sometimes you'll be
23 in the middle of a case or you'll be three weeks
24 before trial and the Court will say, no, this
25 doesn't make any sense, we're not going to wait

1  now. We're too close to the finish line for that
2  to happen, so that's why that's an important
3  factor. Here we're nowhere out of the starting
4  gate.
5         The third factor is very important as
6  well or maybe I'm reversing them because I
7  reversed them in my argument, but the prejudice
8  to the plaintiff, is there going to be undue
9  prejudice? I think as Judge Ericksen or maybe it
10 was Judge Frank said, you know, delay alone is
11 not prejudice. You know, the fact that there's a
12 passage of time is not prejudice. You have to
13 point to something specifically and here there's
14 no question certainly last summer, and they
15 didn't make any arguments last summer really
16 about prejudice, that they will be compensated in
17 damages and pre-judgment interest, whatever.
18        Our sales -- Thomson is a multi-billion
19 dollar corporation. It's not like it's going
20 anywhere and if they successfully navigate the
21 patent office proceedings and we are back in
22 court and they successfully navigate all our
23 arguments and prove infringement, at the end of
24 the day they will be compensated in damages.
25 That's the remedy they will get. That remedy

1  won't change. Their ability to get that remedy
2  won't change. Their ability to recover won't
3  change. None of that will change as a result of
4  any stay of these proceedings and again we're
5  speculating on how long it might be. It might be
6  three, six, twelve, who knows, but during that
7  time period and they haven't raised any other
8  legitimate prejudice.
9         They speculate -- they haven't come
10 forward with any evidence about any actual loss,
11 failure of somebody to license where somebody has
12 gone on record to say that and that's not undue
13 prejudice. You don't get to engineer -- have the
14 Court's engineer economic incentives for parties
15 you want to license. That shouldn't be the role
16 of the court, so they haven't cited a single
17 case, not one, that supports that sort of
18 speculative harm, even if it existed and again if
19 you look at the record they have got to make a
20 record. There's no record here. They need to
21 come forward with declarations from a party and
22 say here's what happening, I would have done this
23 and so forth, so they don't have that record.
24       And then, of course, the middle factor,
25 what do you do? You know, it is a matter of case

management. It is within this Court's discretion how to proceed, but I just think when you consider all of the factors, when you consider whether you are going to start one and then have another one, have multiple scheduling orders, these overlap. They sued the same parties. They are accusing the same products. It's the same technology and so forth and in those circumstances I think you do what Judge Frank did. You know, Pacesetter is right on point. It's the right way to proceed in my judgment, but, you know, I am obviously advocating for defendants here, but I think if you look at those three factors, that's what you do in these proceedings, whether it's been a year out of re-exam, 16 months, 18 months. You say let's look at these, how do they shift, how do they fit in here. I think they all strongly support a stay and consolidation.

THE COURT: Okay. Thank you.

MR. LITSEY: Thank you.

THE COURT: And from Timebase.

MR. HOSTENY: Thank you, Your Honor.

There are two themes that run Thomson's argument that I utterly reject, utterly reject.

One, their supposition is that this Court should wait for the expertise of patent office. Nevertheless, I just heard Mr. Litsey say that we don't know whether the examiner of the 228 looked at these new references. It's late in the game. Maybe he overlooked them and there's an intimation that my client sneaked them in there somehow late in the game in order to slide them by under the door.

The law is that an examiner is a quasi judicial official and has a statutory obligation at all times during an examination, a re-examination and a re-issue to ensure that the statutory requirements are met.

It is, I think, quite surprising that Thomson says let's get the patent office's expertise, but we can't trust what Examiner Hong did.

Examiner Hong, according to the exhibits we provided, has been a supervisory examiner on over 800 cases. There's every reason to believe that he knows his business.

The other theme that I heard is that there's going to be obstructions in discovery. There will be instructions not to answer because

you asked that question the last time. That's not only an improper instruction under the Federal Rules, it assumes that I am going to go to Australia and make trouble for Thomson in this case or Timebase is going to make trouble. I utterly reject the notion and I find it offensive.

If you want us too, I will make sure we do everything to completely circumvent the Hague Convention. We will probably do that in any case to make discovery easy to take.

No. 2, if you want us to, I will have the witnesses that are under Timebase's control here in Minnesota on the coldest day of the decade for their depositions if necessary. I cannot make that representation regarding two inventors because they are no longer with the company, but I certainly will do that and I will certainly tell Timebase it needs to do that with respect to person's under it's control and they will do it.

They have been here before. They were here six years ago. The prior management of Timebase, a small company that's experienced rocky times, they were here before to negotiate with Thomson. The door was closed on them. They

know what Minnesota is like. They are willing to be here. It's a fine place to do business and to litigate a lawsuit.

THE COURT: I think the coldest day was last week though.

MR. LITSEY: He said the decade, Your Honor.

THE COURT: Oh, decade. Yes, I don't know if we've gotten there yet.

MR. HOSTENY: Let's talk about the patents for a moment in this exhibit. The 529 examiner does not have before him any of those portions circled in white. These are two different matters. They are related. I don't know what Thomson means by floundered in the patent office. Timebase filed it's 529 patent application and then filed the 228 as a continuation in part, which every party has the right to do.

The continuation in part means that the descendant patent, the 228, has the same specification plus additional material in it.

And the 228 also differs in another important respect. The 228 cited something like 50 U.S. patents and something like 57

1  publications. If you look at the art cited on
2  the 592 which was years ago when it was
3  originally filed, there's about eight or ten
4  patents cited and a couple of articles. If you
5  look at the 228 you will have to go on to the
6  second page to see the differences between the
7  patents and the 228 sites a far greater amount of
8  prior art, plus as Thomson recognizes, all of the
9  references cited in the re-examination request of
10 the 592. I did not hear Thomson mention that the
11 228 examiner was also given the argument made to
12 support the re-examination of the 592 and
13 considered that as well and that examiner of the
14 228 was given the European observations as well,
15 so the 228 examiner has had everything in front
16 of him.
17      Does an examiner comment upon every
18 reference? No. There's no requirement that an
19 examiner do so. The requirement that the
20 examiner has is to ensure statutory compliance
21 and in more modern patent practice it has become
22 prevalent for people to supply more references
23 and it is highly unusual for an examiner to make
24 a comment upon every reference. I have never
25 seen such a case. That does not mean the

1  examiner has not considered them. In fact, in
2  the file history of the 228 the examiner
3  specifically initialed, which is the way an
4  examiner indicates on a list of references that
5  those references have been considered by the
6  examiner and that the examiner has deemed them as
7  no bar to patentability of the claims of the 228.
8       A little word about European practice
9  because it came up in Mr. Litsey's argument.
10 Europe is Europe, not the United States. It has
11 different standards of patentability. It has
12 something that they call the unity of invention.
13 It's standards on obviousness are not quite the
14 same. It is a first to file system unlike a
15 first inventor system in the United States and
16 the status in Europe is that there have been
17 rejections. The rejections have been responded
18 to so nothing is over in Europe and our client is
19 waiting for the next response from the European
20 patent office.
21      The 592 re-examination can't consider the
22 prior art cited in the 228, cannot invalidate
23 claims in the 228 and cannot cancel claims in the
24 228.
25      Let's look at, for example, a couple of

1  the cases that the defendants cited from this
2  District.
3       THE COURT: You know, as you're
4  talking about that, why don't we combine
5  something that -- when you just said that.
6       MR. HOSTENY: Okay.
7       THE COURT: Is the 592 examiner bound
8  by the 228 passage?
9       MR. HOSTENY: No, I think they are
10 independent. I think the 592 examiner is on his
11 own and must do the same thing that the 228
12 examiner did. The 592 examiner has to comply
13 with the statutory standards in a re-examination.
14 There's no presumption of validity in a
15 re-examination. It's just like a new examination
16 all over again.
17      THE COURT: So you could have the
18 situation where the 228 does go through, but the
19 592 for some reason doesn't and then -- and then
20 what do you do with the 228?
21      MR. HOSTENY: You proceed on the
22 228.
23      THE COURT: Does the 592, for lack of
24 a better term, stuff just fall out.
25      MR. HOSTENY: It depends on what the

1  examiner does there. The examiner may say that
2  the claims are confirmed. The examiner may say
3  that the claims are confirmed with amendments.
4  The examiner may say certain claims are
5  cancelled. The patent owner can add new claims
6  in a re-examination, so that could happen as
7  well, so there's a number of different things
8  that could happen with the 592.
9       THE COURT: I guess what I am trying
10 to get at, depending on all that, does -- is
11 there -- let's -- since I'm apt to have to do
12 this, let's say worst case scenario and for some
13 reason it's thrown out, does then the 228 get
14 re-examined for now, but validity based on the
15 fact that the 59 -- those specifications would
16 have been thrown out or does it just stand on
17 it's own even though the same has been thrown out
18 in another patent?
19      MR. HOSTENY: It stands on it's own
20 except like the Microsoft case that the
21 defendants cited, an issued patent that's a
22 continuation in part can conceivably be
23 interpreted by -- the intrinsic evidence is the
24 claims, the specification and thirdly the
25 prosecution history. The intrinsic evidence does

## Page 42

not include inventor testimony. There's any number of cases saying inventor testimony on claim construction is marginal, if not useless.

And this is -- this is a flaw, I think, that exists in Thomson's argument. With respect to the 228 there is a subsequent pending application that we attached as an exhibit. It's not allowed. It's pending in the patent office.

In the Microsoft case, there was a parent -- a parent patent that issued, then a descendant patent that issued and then from that descendant there was yet another patent that issued.

In the Microsoft case the District Court interpreted the one in between, the middle patent, using statements made in the prosecution history of the subsequent patent.

THE COURT: Okay.

MR. HOSTENY: If we were to follow Thomson's logic, we would say let's wait until all prosecution is done in the patent office because the 592 examiner might say something useful. The examiner of the pending application or applications might say something useful and that all could conceivably, although we don't

## Page 43

know how, could conceivably bear on the 228 patent.

Let's assume the worst case because one of the reasons -- to go back, one of the reasons to differ to the patent office is because the patent and re-examination might be found invalid or claims might be cancelled, so let's assume that the 592 is wiped out. The 228 stands. It is still valid. It is still presumed valid and the statutory right to exclude -- a patent owner's statutory right is not to get damages. The patent owners statutory right is to exclude others from using it's invention.

That's why we say back off a bit when you hear Thomson talk about dollars all the time. Dollars are not the nature of the patent remedy. Often they are part of the relief, but the nature of a patent is the right to exclude.

In any event, even if the 592 gets blown up, which is unlikely, the 228 stands and the 228 can be litigated.

Another point that we have -- well, let's go back. There two cases that I think are interesting on the simplification point. One is VData issuing out of this District and I believe

## Page 44

that's Judge Ericksen and the other is Card Technology. They are both cited in the briefs. They both cite some factors about favoring a stay and, by the way, in the VData case it's interesting because here's the history of VData, two patents in suit, one re-examination was in play. The other re-examination had been requested. Both of them were expiring within about a month or two. No, they both expired in November of 2007, within about year or year and a half of the time the request for re-examination, so the future life is short and according to the patent office's website, which is one of our exhibits, we're 20 months out on one of the patents before an office action issued, so I say take 17 month estimates with a big grain of salt. In the other case we're a year out and nothing has happened.

And as long as I'm on patent office statistics, the two other points I wanted to make about this was you can look at averages. What did Mark Twain say, there are three kinds of lies, white lies, lies and statistics, something along those lines. You can make -- these statistics are so gross and so overall on the

## Page 45

patent office that you have to realize that a number of re-examination requests are denied. Those have a very short lifetime. Those drag the average down.

There are other re-examinations that go on for a significant period of time, longer than the median or longer than the average, whether it's 17 or 22 months.

For example, in one of our cases, the Razmanath [sic] patent, the 314 patent, the re-examination was seven years. It ended about three or four months ago and what happened as soon as it ended? Somebody filed another re-examination request. If an infringer or a defendant can keep this thing in the patent office, then that's great because nothing can ever happen to them.

Irving Younger said the defendant's game is delay because then maybe the world will end and who will care. Delay is the game that Thomson is playing and delay is the game that's prejudicing Timebase in this case.

Here's the factors from VData and Card Tech. In Card Tech there were four patents in suit, two plaintiff, two defendant. The

defendants got stayed for a re-examination and the plaintiff's patents went ahead.

First factor, all prior art presented to the Court will have been first considered by the PTO with it's particular expertise. All prior art has already been presented to the PTO with respect to the 228. Thomson has not invoked any new re-examination.

Many discovery problems relating to prior art can be alleviated by the PTO examination. Okay, let's look at Pacesetter. After the re-examinations were over and those were relatively short, those were about a year or so in that case as I recall, what happened, the defendants said to the plaintiff, you hid some prior art from the patent office. You didn't give the patent office this piece of prior art or that piece of prior art. In other words, games continue after the patent office has done it's job.

Remember last summer we asked the condition of your order be Thomson give us your prior art that you are aware of now. Let's put it into the 592 re-examination. Thomson didn't want to do that. Thomson still doesn't want to

do that.

When these re-examinations -- re-examination is over and this case is litigated, whenever it is, Thomson will have some prior art that the patent office didn't see. Either they know about it now or they will find out about it then, but there will be new prior art.

In those cases resulting in effective invalidity of the patent the suit will likely be dismissed. That can't happen with the 228. The 592 re-exam can't invalidate the 228.

The outcome of the re-examination may encourage a settlement. I think an additional stay here discourages settlement. I think there are things that make people settle cases and what makes people settle cases is a deadline, not something that's off in the far distant future. The way lawyers work, they have got a brief due next week, they have got a trial next month, they have got a response due, that's what's going to make this case settle is deadline and what makes this case settle is no stay.

The record on re-examination would likely be entered at trial. The 228 has a 1,400 page

file history, 14 to 1,500 pages. That record already exists. We don't have to wait for the 592 record which won't do us much good anyway. You know, and the factors in the Card Data case are pretty much the same thing.

The interesting thing that the defendant doesn't -- that Thomson doesn't mention about Pacesetter is, it appears at Page 2, as far as this Court can determine, the parties did not request that Magistrate Judge Nelson allowed discovery to proceed on all four patents on any issues other than validity concurrently with the PTO's re-examination.

If that discovery occurred, with or without prejudice, the case would be nearly ready for trial by the end of re-examination regardless of the outcome of the re-examination. That is something that we think is -- ought to be considered here.

Thomson agrees with us that the products accused are the same, that the damages sought will be established probably on the same guidelines, a reasonable royalty basis. The witnesses are going to be substantially the same. We can have discovery proceed on the 228 and for

that matter on the 592 as well eliminating this duplication issue and if and when there's an order that comes out of the PTO or re-examination certificate that comes out of the PTO regarding the 592, the Court can take it into account at that time, but we can be doing something useful in the meantime which is getting discovery over with, at least with respect to everything other than validity.

I am jumping around. Let me see for a moment.

THE COURT: Can I -- I need to ask another thing.

MR. HOSTENY: Sure.

THE COURT: And maybe you answered a little bit. Whatever.

If the 228 issues on the 6th of November, I think, and this is filed on the 7th, is that right?

MR. HOSTENY: Yes.

THE COURT: With that history?

MR. HOSTENY: Issued on the 6th, filed on the 7th.

THE COURT: So on the one hand maybe delay is the game over here, but on the other

Page 50

 1  hand, you know -- don't you normally -- I mean as
 2  soon as you get an issuance on this, clearly you
 3  start-up again to see if maybe this one will go
 4  through, isn't it the normal practice not to just
 5  rush to the courthouse because if it issues on
 6  November 7th there can be -- can there -- there
 7  can be no infringement until November 7th so
 8  really all we're talking about is possible
 9  infringement between November 7th and then you
10  filed that next day, so forward from there or
11  November 6th or November 7th.
12       It also seems to me to be -- it could be
13  interpreted as a rush to the courthouse because
14  normally wouldn't you send letters or try to
15  negotiate and if nothing else now we're just so,
16  you know, talk to me about that if that makes any
17  sense to you what my question is.
18          MR. HOSTENY: Yes, it does, Your
19  Honor.
20       My experience has been that in most
21  cases, although we still try them, letter
22  negotiations are not effective, particularly when
23  you're dealing with a small entity like Timebase,
24  effectively a start-up company with few
25  employees, and a large organization like Thomson

Page 51

 1  which has layer upon layer upon layer of decision
 2  making that goes on.
 3       I can -- I can't think and I have written
 4  letters in any numbers of instances where I
 5  provide claim charts, patent file histories,
 6  exhibits to the claim charts. I say here are the
 7  patents. We encourage you to take a license. We
 8  would like you to take a license. We're willing
 9  to meet with you. Here's a non-disclosure
10  agreement. We'll share information with you.
11       In one of my cases representing an
12  individual inventor we were so -- we said -- we
13  were told we're thinking about it, we're thinking
14  about it, we're thinking about it. After a year
15  we were told go away. Your client committed
16  inequitable conduct.
17       Just the other day I followed up again
18  with a fellow in Washington regarding another
19  client and he promised me a month ago they are
20  getting their hands around some prior art and
21  it's in Germany, but I will be back to you in
22  mid-January. So mid-January I said, well, Joel,
23  that's happening here. Well, you have got all
24  those pending Summary Judgement Motions in that
25  case in Chicago that involve the same patent so

Page 52

 1  we don't want to do anything now. I told them
 2  all the Summary Judgement Motions had been
 3  decided. You can't get that first base.
 4       I don't go this far, but there's a lawyer
 5  in Detroit and there's some sense in what he
 6  says, the only letter I send is a complaint
 7  because that's what makes people move. You can't
 8  make them move otherwise. It's like trying to
 9  move a mountain with some of these organizations
10  and the history with Thomson has been
11  negotiations were unsuccessful. Timebase came
12  here in 2001 one, negotiated with Thomson and
13  went home. No deal could be struck.
14       The 592 case was started. There's no
15  negotiations there. No deal could be struck.
16  The case went into a stay. Our feeling was if we
17  have a new patent and we have already waited
18  eight or nine months because we took the unusual
19  step of going back to the patent office, you have
20  to petition to make them withdraw from issue.
21  You can't normally -- you can't just ask. When
22  they grant the petition, then you file an
23  information disclosure statement. You give the
24  examiner the references and then you wait and
25  that's another eight or nine months of time that

Page 53

 1  our client incurred.
 2       They just made what I think is a
 3  reasonable judgment not to wait any longer for
 4  Thomson to come around to the bargaining table.
 5  That's kind of where we are on that one.
 6       Meanwhile we have put something
 7  additional on your plate, but it's the only place
 8  we have to come to for relief in my opinion and
 9  Timebase is not interested in a quick victory.
10  Does it hope to win? It sure does. It sure does
11  and I have confidence in it's case.
12       What Timebase does want is it's day in
13  court. That's what it really, really wants, it's
14  day in court, up or down, win, lose, it wants to
15  take it's shot.
16       On the stay business, there's just one
17  last thing I would like to mention and then I
18  think I have covered most of my points. The
19  remaining ones probably -- Ethicon vs. Quig [sic]
20  cited by Thomson relies for the proposition that
21  a court has the inherit power to grant a stay on
22  the Supreme Court's decision in Landis and Landis
23  Justice Cardoza said in part the suppliant for a
24  stay must make out a clear case of hardship or
25  inequity in being required to go forward if there

## Page 54

is even a fair possibility that the stay for
which he praise will work damage to someone else.
 And just immediately preceding is this
how -- how this can best be done calls for the
exercise of judgment which must weigh competing
interests and maintain an even balance. Stays
are not routine. If a court considers an
established set of factors, that's fine.
 Bottomline, I just want to mention while
I am going by on this Ella case that the
defendants relied upon fairly heavily, there's
one patent in suit that was a member of a family.
One of the other family members was being
re-examined and three of the remaining family
members had been asserted against the same
defendants in the International Trade Commission
and the ITC found that the other three were not
infringed so the Court in Ella said, look, in
this family out of the five we have got three
that are on appeal because the ITC said they are
not infringed. We have got one that's
re-examination which seems to me to be a case for
a stay and I think that's an exercise of
reasonable judgment and there's no question that
this is a discretion of the court.

## Page 55

 The VData case I already addressed.
 The Pacesetter case I did want to mention
briefly. The party that invoked the
re-examination there was the plaintiff filed on
four patents and then the plaintiff invoked the
re-examination on two. That's not something that
Timebase has done here. If Timebase did do
anything like that it did it in the 228 ahead of
time by going back to the patent office.
 And the claims in the 228 are narrower
and in my view hit Thomson's products right on
the head even better than the 592 claims do.
 Unless you have questions, Your Honor, I
am done. Thank you.
 THE COURT: That's it. Brief
response, if any.
 MR. LITSEY: Thank you, Your Honor.
 THE COURT: I am going to take it
under advisement, maybe not surprisingly.
 MR. LITSEY: You have been very
patient, so I will be quick.
 One thing to keep in mind is what
happens -- what are we talking about in this
re-exam? It's not just the expertise of the PTO.
The main thing that affects the scope and shape

## Page 56

of the patent is what Timebase says about them.
They are bound by their statements. That's the
main point. They defined -- they will redefine
their patent, the scope of the claims based on
what they say. We're not necessarily sitting
around for the expertise of the PTO so much as
once the PTO makes an argument, Timebase needs to
respond to it. That response determines the
scope of the patent. And as Mr. Hosteny
acknowledged, the examiner there will examine it
on his own and he may come to an entirely
different conclusion then what the European
patent office has judged so far and what the 228
examiner judged.
 Again, I just point out, they talk about
delay and our game is being delay, I think I take
umbrage at that. We didn't file the re-exam,
even though it's a perfectly reasonable,
legitimate thing to do, we weren't the party to
do that. They have been the ones who have
proceeded with piecemeal patents having sat on
prior art in the patent office that they knew
about in 2002 when they talk about these
extraordinary efforts they went through to
retract and withdraw and then bring it suddenly

## Page 57

to the intention of the patent office.
 They knew about two of those references
back in 2002 when the European patent office told
them about it when they turned up in their
search, so we are the innocent party here.
 Defendants have to be presumed innocent
in this court. None of this is of our making.
We're trying to make the best of a bad situation.
What do we do? There is this re-exam that's
pending. What do we do about it. That's the
question before the Court, not who's to blame for
it or anything else. We certainly didn't bring
it, but what do we do about it and the fact is
that as long as you have that re-exam taking
place, statements they will make in that
examination can dramatically or mildly or perhaps
not at all change what's going to happen going
forward.
 But the point is there is a very real
possibility of that happening and that's why
courts routinely, all the time, grant stays when
there's re-exams and this patent is tied to the
592. What they say about the 592 affects what
they say about the 228.
 They have come in and they are relying on

Page 58

the priority date of the 592 patent. They are trying to get behind the prior art. They filed later on the 228. They are trying to get the benefit of the 592. They are stuck with the specification of the 592 if they are going to rely on it for it's earlier priority date, that's why these are so tied together. You can't get more related cases.

Mr. Hosteny talked about the right to exclude as being one of the statutory benefits. That's true, but you have to prove a case for injunction to do that. They don't have an injunction case. If you look at the U.S. Supreme Court's case in Ebay from 2006, under no circumstances when they are not operating or competing in this market are they entitled to an injunction. They are looking at damages. This is a damages case. That's what he will seek. There's no undue prejudice to them for having to wait and getting an additional pre-judgment interest or whatever at the end of the day.

And I just have to bring up the small company thing, Your Honor, because if anybody sort of obfuscated on that, it really isn't a relevant factor because Timebase isn't doing

Page 59

business here and there's no undue prejudice to them, but as far as I can tell, they are either owned by or managed or whatever by the Deutsch Bank Group of companies. Deutsch Bank alone has 730 billion dollars in assets. It's a six billion dollar revenue banking company, whether it's Deutsch Bank or one of it's subsidiaries controlling them, I don't know, but this notion that they are a small struggling business frankly doesn't -- rings hollow.

That's all I have. Thank you.

THE COURT: All right. Thank you. I am going to take it under advisement, as I obviously asked a lot of questions today because I wanted to understand some of those things that I asked about. I think I do now, so I will -- I plan to do this again as -- at least right now I plan to do it as on order as I did last time. I know that there have been some that have been issued as R and R. I think we talked about that last time, that we certainly have the authority to do it as an order and Judge Ericksen didn't seem to mind that at least in the sense that she didn't overrule me just because it was an order, but -- so that's probably the way it's going to

Page 60

come out one way or the other. I will try to do it as quickly as we can so you know what's going on. All right. Thank you so much.

MR. LITSEY: Thank you for your time.

MR. HOSTENY: Thank you so much.

* * *

Page 61

STATE OF MINNESOTA  )
                    ) ss.
COUNTY OF DAKOTA    )

BE IT KNOWN, that I transcribed the tape-recorded proceedings held at the time and place set forth herein above;

That the proceedings were recorded electronically and stenographically transcribed into typewriting, that the transcript is a true record of the proceedings, to the best of my ability;

That I am not related to any of the parties hereto nor interested in the outcome of the action;

WITNESS MY HAND AND SEAL:

_____
Leslie Pingley
Notary Public