# Exhibit 5
# Part 13
# To Third Declaration of
# Joseph N. Hosteny

The limitations of claim 1 of the '988 patent are also anticipated by FIG. 2 of Campbell, which is a more detailed illustration of the teaching of FIG. 1. A bank of first deposit 36 (type of bank 14) and a payor bank 34 (type of bank 16) interchange images through the check processing node 12. For example, check images may be transmitted in a "forward flow path from a bank of first deposit [through the check processing node 12] to a payor bank." Campbell, col. 7, lns. 65-68. The bank of first deposit may have check processing equipment for generating images of the checks. Campbell, col. 4, lns 18-21; col. 3, lns 46-48. Thus, the bank of first deposit 36 may be considered a remote data access subsystem that transmits images to the check processing node 12 (a central data access subsystem), for the forward presented of check images.

Claim 18 requires an intermediate data collecting subsystem in between the remote and central subsystems. This limitation is taught by the embodiment of Campbell described above, wherein a bank of first deposit 36 may transmit images to the check processing node 12. This transmission may be through an intermediary bank 14, which forwards received images and is located in between the bank of first deposit 36 and the check processing node 12, "[o]ne or both institutions 14 and 16 may also be any intermediary institution in the forward and reverse check clearance flows between a bank of first deposit and a payor bank." Campbell, col. 2, lns 46-49. Thus, the workflow of images is: (1) images are captured at the bank of first deposit 36; (2) the images are transmitted from the bank of first deposit 36 to an intermediate bank 14; the images are transmitted from the intermediate bank 14 to the check processing node 12, thus meeting the limitations of claim 18.

Claim 29 (plurality of remote locations, plurality of central locations), depends on claim 26 (the method embodiment of claim 1). Both claims 26 and 29 are anticipated by Campbell

### b. Claims 3-8 and 28 are obvious over Campbell in view of admitted prior art

As acknowledged by the applicant in the '988 patent, "[a]s is known to persons of ordinary skill in the art, the DATs 200 could also include additional devices for capturing other biometric data for additional security. These devices include facial scans, fingerprints, voice

prints, iris scans, retina scans and hand geometry." The '988 patent, col. 6, lns 46-60.[9] This statement of the knowledge of the art qualifies as an admission of prior art. See MPEP §§ 706.02(c); 2129; 2133.03(c). Additionally, as is noted in Section III(4), *infra*, Owens et al. describes that electronic transaction card and biometric peripherals may be used in connection with a system of capture and storage.

Claim 3 and its dependent claims 4-8 and further claim 28 of the '988 patent relate to capturing additional information such as transactional data, biometric data, and signature data. Such teaching is clearly taught by the patentee as being obvious additional limitations to the remote capture system.

Campbell teaches the compressed tagged image of claim 4 (Campbell, col. 7, lns. 15–27). Campbell teaches the digital storage of claim 5 (Campbell, col. 6, lns. 57-60.). Claims 6-8 and 28 contain further limitations which are admitted "well known to those in the art." *See* '988 at col. 5, ln 58 - col. 6, ln 6.[10]

      c.    **Claims 9, 11-15, 19, 30-32 are obvious over Campbell in view of Owens and Minoli**

Claim 9 details further elements of the data management subsystem of the central data processing subsystem, such as a "polling server" (Minoli, p. 33; 350; Owens, col. 12, lns 12-16); a database (Owens, col. 12, lns 18-27); a report generator (Owens, col. 14, lns 12-18); a CPU (Owens, col. 12, lns 27-36); a domain name services program (Owens, col. 21, lns 1-17; Minoli, p. 248-49); and a memory hierarchy (Owens, col. 12, lns 23-27). Claim 19 parallels claim 9. Claim 19 depends on claim 18, which describes a collecting subsystem in between the remote

---

[9] This admission is referred to in the attached claim charts as "admission."

[10] "In addition to scanning images and text, the DAT scanner 202 also scans DataGlyph™ elements, available form Xerox Corporation. As is known to persons of ordinary skill in the art, the Xerox DataGlyph™ Technology represents digital information with machine readable data which is encoded into many, tiny, individual glyph elements. Each glyph element consists of a 45 degree diagonal line which could be as short as 1/100th of an inch depending on the resolution of the scanning and printing devices. Each glyph element represents a binary 0 or 1 depending on whether it slopes downward to the left or the right respectively. Accordingly, DataGlyph™ elements can represent character strings as ASCII or EBCIDIC binary representations. Further, encryption methods, as known to persons of ordinary skill in the art encrypt the data represented by the DataGlyph™ Technology." *Id.*

and central subsystems. Claim 19 specifies that the data management subsystem (controller or CPU) of the collecting (intermediate) subsystem of claim 18 comprises a server; a database; a CPU; and a domain name services program; and a memory hierarchy. Each of these limitations is expressly taught by either Owens or Minoli.

The limitation of claim 11, wherein the memory hierarchy comprises at least one primary memory for storage and at least one secondary memory for storage, is specifically taught by Owens, col. 12, lns 23-27.

Claim 12, dependent on claim 11 and thus claim 9, describes the memory hierarchy of claim 9 as comprising a WORM jukebox and an optical storage jukebox. Both types of storage may be used to store check images, as discussed in Minoli, pp. 30-31 and Chapter 7.

Claim 13, dependent on claim 12, specifies that the optical storage jukebox comprises read only memory technology including compact disc read only memory. CD-ROM optical storage is described as being faster (150 kbps) than video servers. Minoli, p. 33.

Claim 14 is drawn to the database of claim 9 comprising at least one predefined template for portioning the stored transaction data into panels. Owens discusses ways of storing the data into predefined fields, "machine pattern recognition units" which include "a conventional character recognition reader which read the decompressed image of a document 18 and ascertains the monetary amount thereon." Owens, col. 23, lns 44-47.

Claim 15 depends from claim 14 and adds that "a data entry gateway for correcting errors in the panels of stored transaction data." Owens describes this limitation wherein transaction data is sent to a workstation wherein an operator may correct any errors through viewing the image, "[w]hen data is missing, the associated image is routed to one of the processors 396, 398 for display on one of the CRTS 150 where an operator keys in the appropriate data on an associated keyboard 152." Owens, col. 23, lns 47-52.

Claim 30 parallels claim 9. Claims 31-32, parallel to claims 14-15, are dependent on claim 30. Thus, each of these limitations is taught by Minoli and Owens

As admitted by the patentee of the '988 patent, "[a]s is known to persons of ordinary skill in the art, the DAT 200 could also be custom designed around a general purpose network computer running other operating systems as long as the chosen operating system provides

support for multiprocessing, memory management and dynamic linking required by the DataTreasury™ System 100." The '988 Patent, col. 6, lns 46-60. Thus, the Specification of the '988 patent itself acknowledges that an operating system that provided memory management, multiprocessing, and dynamic linking, elements found in claim 9 were known to those of ordinary skill for use in the kinds of systems described in the prior art. This admission at the very least provides evidence that one in the art would know to combine the well known teachings of Owens with other check imaging systems and methods, such as the check interchange system of Campbell.

### d. Claims 17, 22-25 and 37 are obvious over Campbell in view of Minoli

Claim 17, dependent on claim 16, describes modems for connecting the first LAN to the WAN and a bank of modems for connecting the second LAN to the WAN. Using a dial-up or modem connection to a WAN was well known in the art and is specifically described in Minoli. Minoli, p. 263.

Claim 22 depends on claim 18, which describes a collection subsystem in between the remote and central subsystems. Claim 22 adds further architecture to the communication network of claims 1 and 18, such as a first, second, and third LANs corresponding to the remote subsystem, the collection subsystem, and the central subsystems, and a WAN for transmitting data between the remote and the central subsystems. Minoli teaches that several LANs may be interconnected through a WAN, such as in a banking or check processing environment. Minoli, p. 31; 269-271.

Claims 23-25, dependent on claim 22, describe hardware that is typically part of a communication network and that is expressly taught by Minoli. These claims add limitations of a modem (Minoli, p. 263); a bank of modems (Minoli, p. 263); routers (Minoli, p. 269); a carrier cloud using frame relay (Minoli, p. 268); and a network switch (Minoli, p. 268).

Claim 37, dependent on claim 36 and thus 29 (both anticipated by Campbell) adds limitations relating to: polling (Campbell, col. 3, lns 30 – 39); storing (Campbell, col. 3, lns. 43-58); and dynamically assigning (Campbell, col. 3, lns 30 – 39; Minoli, p. 248-49).

### e. Claims 10 and 33 are obvious over Campbell in view of admitted prior art

Claim 10, dependent on claim 9 (obvious under Campbell in view of Owens and Minoli), incorporates the biometric and signature data limitations as admitted by patentee to be well known additions to a remote capture system.

Similarly, claim 33, dependent on claim 32 (obvious under Campbell in view of Owens and Minoli), incorporates the biometric and signature data limitations as admitted by patentee to be well known additions to a remote capture system. '988 patent, col. 6, lns 46-60.

### f. Claims 34-35 are obvious over Campbell in view of Owens and Minoli

Claims 34-35 are dependent on claim 32, but add limitations that are taught by Campbell These limitations include: transmitting within the remote subsystem (Campbell, FIG 1); transmitting between the remote and central subsystems (Campbell, col. 2, lns. 26-32); transmitting within the central subsystem (Campbell, col. 3, ln 41-52); connecting the remote to the central subsystem (Campbell, col. 3, lns. 20-43); and connecting the central subsystem to the remote subsystem (Campbell, col. 3, ln 32-52).

### g. Claims 20-21 are obvious over Campbell in view of Minoli

Claims 20-21, dependent on claim 19, are drawn to the memory hierarchy of claim 19. Claim 20 adds limitations of a primary memory for collecting transaction data and a secondary memory for backup storage of the transaction data. Campbell, describes temporary and long-term archiving of the images at the check processing node 12. Campbell, col. 7, lns 6-8. Claim 21 describes a type of magnetic tape storage device. Minoli describes several image storage systems including: CD-ROMs, WORMs, recordable CD, and magnetooptic (MO) storage. Minoli, Chapter 7, p. 219.

### h. Claims 36 and 38-41 are obvious over Campbell

Claims 36 and 38-41 are each dependent on claim 29, which is anticipated by Campbell Claim 36 (the method embodiment of claim 18) describes a collecting step at an intermediate location, such as at the intermediary bank 14. Campbell, col. 2, lns 46-49. Claim 36 also requires a transmitting of the transaction data within the intermediate location and between the

intermediate locations and the central locations. As described above with respect to claim 18, Campbell teaches that such a collection may occur at an intermediary bank 14 (intermediary) that transmits check images between the bank of first deposit and the processing node 12. Campbell, col. 2, lns 46-49.

Claims 38-41, add further steps, relating to connecting and transmitting among the three locations. Campbell teaches these connections and transmissions among 3 tiers, specifically as to the bank 14, the node 12, and the bank 16. However, these connecting and transmitting steps are directly applicable to the connecting and transmitting among the bank 36, the bank 14, and the processing node 12 (specifically described as in claims 18 and 36). These include: transmitting between the remote and intermediate (Campbell, col. 2, lns 25-33); transmitting between the intermediate and central (Campbell, col. 2, lns 25-33); connecting the remote to the intermediate location (Campbell, col. 3, lns 30-39); connecting the intermediate to the central location (Campbell, col. 2, lns 25-33; col. 3, lns 30-39); connecting the intermediate to an external network (Campbell, col. 2, lns 25-33; col. 2, lns 50-63; col. 3, lns 30-39); connecting the central location to the communication network (Campbell, col. 2, lns 25-33; col. 2, lns 50-63; col. 3, lns 30-39); packaging the transaction data into frames (Campbell, col. 3, lns 30 - 39); and transmitting the frames through the external communication network (Campbell, col. 3, lns 30 - 39).

### 3. The ANSI/ABS X9.46-1995, version 0.13 Standard for Financial Image Interchange Anticipates Claims 1 and 26

#### a. The ANSI Standard and the Drafts that Preceded It Are Printed Publications under 35 U.S.C. § 102

In the 1990s, the financial industry developed an electronic data interchange standard for the exchange of check images and financial data across a computing network. The Accredited Standards Committee X9 Financial Services voted on and approved the standard. The Working Group X9B9 on Image Interchange (the "Working Group"), which reported to Subcommittee X9B, developed this standard. These facts are set forth in the Declaration of R. Jesmajian, attached hereto as Exhibit K, which is provided to substantiate that the ANSI documents are in fact printed publications within the meaning of the statute. *See* Jesmajian Decl. at ¶ 2.

From approximately 1993 to 1996, several versions of a draft document covering a proposed standard for the interchange of images among financial institutions (the "draft documents") were created by the Working Group leading up to the publication of the ANSI X9.46 Standard. *Id.*, ¶ 5. The document entitled, "ANSI/ABA X9.46-1995, Draft version 0.13, American National Standard For Financial Image Interchange: Architecture, Overview and System Design Specification," (the "ANSI/ABA X9.46-1995 document"), was one of the draft documents distributed to and used by the Working Group in 1995 in order to develop the ANSI X9.46 Standard. *Id.*, ¶ 7. The ANSI/ABA X9.46-1995 document is attached hereto as Exh. I.

The ANSI/ABA X9.46-1995 document is a printed publication and is therefore appropriately considered by the Office for purposes of reexamination. To constitute "publication," a document must be accessible to the public. *Garrett Corp. v. United States*, 422 F.2d 874, 877 (Ct.Cl. 1970). The public necessarily includes only "that class of persons concerned with the art to which the document relates and thus most likely to avail themselves of its contents." *Id.* at 878. In *Garrett Corp.*, the court determined that a report written by a government agency that detailed equipment and procedures for boarding large inflatable rafts that was distributed to 6 commercial companies with no restriction on use qualified as a publication. *Id.* at 877. Furthermore, reports composed by a joint venture of several member companies and distributed to each participating member constituted a publication since "those with access to the documents were ... a *significant portion* of the interested public" and because the papers were not treated as confidential by those participants even though there was a confidentiality label on a single page of the entire report, and because "any other interested persons exercising reasonable diligence could have sought information ... from [the joint venture]" as the information "was available without restriction." *Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.*, 291 F.3d 1317, 1323-1324 (Fed. Cir. 2002).[11]

---

[11] *See also, Crane Co. v. Goodyear Tire & Rubber Co.*, 577 F.Supp. 186, 197 (D.Ohio. 1983) (plaintiff attempted to market its system to its three major customers by distributing individualized technical proposals and detailed circuit diagrams to those three customers, such distribution to an interested segment of the public was sufficient to constitute publication, and the documents qualified as printed publications because plaintiff "intended and actually did distribute the documents to its major commercial customers who comprised the interested population in the United States" despite the fact that some of the documents had a confidentiality label affixed thereto); *Construction Technology v. Lockformer Co.*, 1990 U.S. Dist. LEXIS 20000 (D.N.Y., 1990) ("distribution to commercial companies or

The ANSI/ABA X9.46-1995 document qualifies as a "printed publication" because it was not only accessible to the relevant public, but it was distributed to the same. The members of the Working Group who developed the image interchange standard included about 40 individual members from: (1) the Federal Reserve Bank; (2) financial institutions such as Bank of America, Wells Fargo Bank, Chase Manhattan Bank, Mellon Bank, Banc One, Wachovia, and the New York Clearing House; and (3) vendors of document and check imaging products and services, such as AT&T (including NCR), IBM, and Unisys, servicing the financial industry. (Jesmajian Decl., ¶ 3). These members of the Working Group represented a substantial cross-section of the financial industry that was interested in check imaging projects during this time period. *Id.*, ¶ 4. Membership to X9B was generally granted to a member of this industry upon request. *Id.* Thus, the Working Group represented entities that would have been interested in the contents of the document and would have used its teachings to implement check interchange imaging systems.

The ANSI/ABA X9.46-1995 document was one of the draft documents distributed to the individual members of the Working Group. *Id.*, ¶ 7. This draft document was disseminated to the members of the Working Group in order to elicit feedback on the technical aspects of the proposed standard. *Id.*, ¶ 6. The individual members of the Working Group were free to collect feedback from their respective organizations using these draft documents. *Id.* Thus, a significant portion, if not all of the major financial institutions and vendors servicing financial institutions in this time period would have had a copy of the ANSI X9.46-1995 document in their possession. There was no confidentiality or restriction of use label on the ANSI X9.46-1995 document.

In addition to the Working Group members having copies of the ANSI/ABA X9.46-1995 document, this same document was distributed to the 75 members of the Subcommittee X9B for

---

potential customers without restrictions on use constitutes publication"); *Friction Div. Products, Inc. v. E. I. Du Pont de Nemours & Co.*, 658 F. Supp. 998, 1008 (D. Del., 1987) (using the availability to commercial companies as a fact establishing publication of a document); *Vetco Offshore Industries, Inc. v. Rucker Co.*, 448 F.Supp. 1203 (D.Cal. 1978) (holding that drawings distributed directly or indirectly to some 30 companies constituted publication because "it appears beyond question that the companies represented the major part of the public interested in the particular art involved" even if "the record does not disclose how many companies other than those specified ... were interested in [the invention]"); *Maurice A. Garbell, Inc. v. Boeing Co.*, 385 F.Supp. 1 (D.Cal. 1973) (ruling that the fact that the author distributed his manuscript to many people in public and private agencies showed his intent to disseminate the contents of the document).

voting.[12] Furthermore, the draft documents, including the ANSI/ABA X9.46-1995 document would have been available to members of the financial industry upon request or reasonable diligence. *Id.*, ¶ 4, 10.[13] Members of the financial industry knew that a standard relating to the interchange of images was being developed at this time. *Id.*, ¶ 9. The Working Group did not keep its activities confidential or restrict its membership. *Id.* Industry-wide participation in the development was encouraged. *Id.* Thus, the ANSI/ABA X9.46-1995 document is a "printed publication" having a publication date of 1995.

This standard was published by the ABA and became known as the "X9.46 American National Standard For Financial Image Interchange." (Jesmajian Decl., ¶ 2). The ANSI X9.46 Standard was approved by the American National Standards Institute, Inc. on January 21, 1997 and was published by the American Bankers Association with a copyright notice of 1996, thus qualifying as a printed publication under 35 U.S.C. § 102(a). A copy of the ANSI X9.46 Standard as approved on January 21, 1997 is also attached as Exh. J and will be referred to as "ANSI X9.46-1997."

### b. The ANSI standard, as described in ANSI-1995 and ANSI-1997, anticipates independent claims 1 and 26

An element-by-element comparison of claims 1-41 of the '988 patent to the teachings of the ANSI/ABA X9.46-1995 document is provided in Exhibit L. At least each and every element

---

[12] It was a duty of the Working Group to develop a standard to present to the Subcommittee X9B on Check Processing ("Subcommittee X9B") for voting and approval. The Subcommittee X9B consisted of about 75 individual members. Similar to the Working Group, the members of the Subcommittee X9B included members from: (1) the Federal Reserve Bank; (2) financial institutions such as Bank of America, Wells Fargo Bank, Chase Manhattan Bank, Mellon Bank, Banc One, Wachovia, and the New York Clearing House; and (3) vendors of document and check imaging products and services, such as AT&T (including NCR), IBM, and Unisys, servicing the financial industry. The ANSI/ABA X9.46-1995 document was distributed to the 75 members of the Subcommittee X9B for voting. (Jesmajian Declar., ¶ 8).

[13] Such availability of working draft documents is further evidenced in the Financial Services Technology Consortium ("FSTC") Publication No. WO 97/22060 and U.S. Application Serial No. 08/571,099 (filed December 12, 1995), which incorporates the ANSI standard by reference, "[d]etails of the X9.46 proposed standard are set forth in the ANSI X9.46 Data Structure Reference, available from the X9B working group within ANSI and incorporated by reference." p. 13, lns 14-17 (emphasis added) (attached as Exhibit M).

of claim 1 and 26 of the '988 patent is taught by the ANSI X9.46 standard protocol as described in this document and thus should be rejected under 35 U.S.C. § 102(b).

Independently, claims 1 and 26 are anticipated under 102(a) by the ANSI X9.46-1997 document. The citations to "ANSI" will thus refer to two documents: (1) the document entitled "ANSI/ABA X9.46-1995, Draft version 0.13, American National Standard For Financial Image Interchange: Architecture, Overview and System Design Specification" and (2) the ANSI X9.46-1997 document. Each document substantively contains the same elements for purposes of claim comparison. Thus, for each of the passages relied upon, there will be citations to each of the 1995 and 1997 documents.

The ANSI/ABA X9.46 standard describes an electronic data interchange protocol for the exchange of electronic digitized images of financial documents among different financial institutions involved in a payment transaction. The exchange occurs across diverse computing platforms. "Packaged interchange content is delivered from the originating imaging application's financial image interchange translator to the receiving imaging application's financial image interchange translator . . . through a computer network by transmitting the . . . data electronically." §5.1.5 Transfer Mechanism; ANSI-1995, p. 15-16; ANSI-1997, p. 16. Thus, the original imaging application captures images of paper transaction data, *i.e.*, checks. ANSI-1995, p. 9; ANSI-1997, p. 9. The originating financial institution is "remote data access subsystem for capturing and sending paper transaction data."

Functional groups are packaged and interchanged between financial institutions. ANSI-1995, p. 14; ANSI-1997, p. 14-15. One type of functional group is "item views". ANSI-1995, p. 14; ANSI-1997, p. 14. "Item Views" include imaged items, such as checks or other financial documents. ANSI-1995, p. 14; ANSI-1997, p. 14. In addition to images, a data element known as "creation computer" which "conveys the system name of the originator's host computer that was used to create and digitize the imaging data" may be transmitted. ANSI-1995, p. 105; ANSI-1997, p. 105. Thus, both paper transaction data, i.e., images of documents such as checks, and subsystem identification information, i.e., the creation computer data element, are transmitted from a remote data access subsystem.

Both the originating (remote) and receiving (central) financial institution have a translator. ANSI-1995, p. 12; ANSI-1997, p. 12. "The data to be interchanged from the

originating imaging application are packaged by the FII-translator." ANSI-1995, p. 12; ANSI-1997, p. 12. The translator "(FII-translator) function of the originating application produces an interchange object (i.e., a complex data structure) by translating the output of the local imaging handling, data processing, or data storage application into a standardized interchangeable 'edi' structure." ANSI-1995, p. 14; 202-203; ANSI-1997, p. 14. At the central subsystem or receiving institution, "upon receipt of the interchanged data, the FII-translator will parse the incoming data for the receiving imaging application." ANSI-1995, p. 12, lines 406-409; ANSI-1997, p. 12. Then, the receiving imaging application may generate acknowledgements or replies to query requests, and become the originating imaging application for a new image interchange." ANSI-1995, p. 12; ANSI-1997, p. 12. Thus, the central data processing subsystem or the receiving financial institutions processes, sends, verifies, and stores the paper transaction data and subsystem identification information.

The ANSI X9.46 standard describes the communication network of claim 1. "[P]ackaged interchange content is delivered from the originating imaging application's financial image interchange translator to the receiving imaging application's financial image interchange translator is through a computer network by transmitting the packaged interchange data electronically." ANSI-1995, p. 15-16; 199; ANSI-1997, p. 16. Examples of communication methods include "teleprocessing methods: links, network end point addresses, speed, data transfer protocols, etc." ANSI-1995, p. 172; 199; ANSI-1997, p. 173. Thus, transaction data may be transmitted within and between the financial institutions.

Encryption and various security methods are expressly described. ANSI-1995, p. 55-61; ANSI-1997, p. 55-61. The standard describes specific data elements that are encrypted prior to transmission, "[e]ncryption key name... conveys the name of the key used to encipher the contents of this functional group. The name is mutually known to the security originator and the security recipient, is unique for this relationship, and allows a particular key to be specified." ANSI-1995, p. 57; ANSI-1997, p. 57. Thus, data elements are encrypted (enciphered) at the functional group level. This is further supported by the initialization vector showing the length of the data element to be encrypted. ANSI-1995, p. 55-57; ANSI-1997, p. 55-57. As explained, one (1) type of functional group is known as "item views." The check images are item views. The "creation computer" which identifies the computer that creates the image is also an item view data element. ANSI-1995, p. 93-94; 105; ANSI-1997, p. 93-94. Thus, the originating

institution (remote subsystem) provides encryption to both the images and the subsystem identification information. The illustration below combines the relevant portions of Fig. 3 on p. 14 (with the addition of the encryption key name), which shows the relationship between a functional group and its components and a transaction set and its components, with relevant portions of Fig. 9 on p. 33, which illustrates the contents of the item views functional group.



## D. Other cited art

### A. Owens, U.S. Patent No. 4,264,808

In the original examination, the Examiner cited U.S. Patent No. 4,264,808 to Owens, which describes a Point of Acceptance ("POA") which "captures (in image form) all information from documents (Checks, deposits, etc.) presented thereat and prepares and transmits this

information to the associated Image Processing Center (IPC) 14." Owens, col. 8, lns 41-44. Encryption techniques were well known in the financial industry at the time of the '988 patent.[14]

## IV. The Patent Owner Has Represented that the Claims of the '988 Patent are Broad

A significant segment of the financial industry been sued by DataTreasury Corporation ("DataTreasury", the '988 patent assignee). Currently,[15] DataTreasury is aggressively asserting the '988 patent against several defendant financial institutions and vendors, including Bank of America Corporation, Citigroup, Inc., Wachovia Corp., Wells Fargo & Co., First Data Corporation and related entities, SVP Company (part of the Clearing House Payments Company), MagTek, NCR Corporation, EDS, and Viewpointe Archive Services.

DataTreasury purports that its claims validly cover a wide array of check imaging applications used by this assortment of the financial industry, including internal use of check images within a bank, check interchange among banks, point-of-sale check imaging applications, and the use of check images in the payment/clearing system. These allegations have been reiterated by DataTreasury in various press releases, wherein it broadly states that the patents are "for image capture, centralized processing and electronic storage of document and check information."[16] Another characterization of the patents is that "Ballard's technology enables a bank to scan the check, send it and store it securely and even mine the data on the check."[17]

Moreover, DataTreasury has alleged that "[t]hese patents describe a technology process capable of implementing the federally enacted Check Clearing for the 21st Century Act,

---

[14] The Examiner in the original prosecution rejected the '988 claims under § 103 over Owens et al. in combination with a number of encryption references (Lee, et al. (USP 4,912,762), Elander, et al. (USP 4,500,750), and Zeidler (USP 4,578,530)). See also, e.g., U.S. Patent No. 4,536,647 to Atalla et al., filed on July 15, 1983, wherein a banking terminal encrypts a PIN and entity and terminal codes to produce a personal verification number and subsequently transmits a random number generated from the personal verification number.

[15] In addition to the current litigations, the patentee had enforced the '988 patent against defendants J.P. Morgan Chase, Banc One, Zions National Bank, NetDeposit, RDM, ACS, and Ingenico.

[16] <www.finextra.com/fullpr.asp?pf=y&id=4989>. "JPMorgan Chase and DataTreasury settle Patent dispute," DataTreasury Corporation Company Announcement, July 6, 2005 (included in Exhibit Q).

[17] "Melville, N.Y. – Based DataTreasury Fights J.P. Morgan Chase over Patent," Newsday, Tania Padgett, October 22, 2003 (included in Exhibit Q).

popularly known as 'Check 21.'"[18] As these statements demonstrate, DataTreasury will continue to bring lawsuits under the '988 patent unless and until its claims are properly held unpatentable in a reexamination proceeding. As its CEO stated recently, "DataTreasury's business is built on an invention that we believe has been copied by others, and we have been forced to take this matter to court. In each and every one of these suits, there are two possible outcomes: settlement and licensing or a trial."[19] There is a third option that the CEO forgot about – a holding in reexamination that the '988 patent claims are unpatentable.

## V. Conclusion

The newly cited references, alone, or in combination with each other or with art previously made of record, raises substantial new questions of patentability and render the claims of the '988 patent unpatentable. Accordingly, these submitted references serve as a basis for a reexamination of the '988 patent.

Respectfully submitted,

Date: November 23, 2005

Jeffrey P. Kushan
Registration No. 43,401

SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street N.W.
Washington, D.C. 20005
Tel. (202) 736-8000
Fax (202) 736-8711

---

[18] *Id.* Check 21 is the federal legislation passed at the end of 2004 designed to enable banks to handle check images in presentment and settlement processes. See www.federalreserve.gov/paymentsystems/truncation/faqs.htm .

[19] "Check Technology Case Stays In Texas," IP Law Bulletin, October 13, 2005.

## CERTIFICATE OF SERVICE

I hereby certify that on this 23 day of November, 2005, a copy of the foregoing Request for Reexamination Under 35 U.S.C. § 302 and Information Disclosure Statement Under 37 C.F.R. § 1.510, including exhibits, was served upon the following via First Class Mail:

DataTreasury Corporation
175 Pinelawn Road
Suite 200
Melville, NY 11747
Phone 631.486.5500
Fax 631.486.5555

_____
David L. Fitzgerald
Reg No 47,342